[Cite as *In re N.L.*, 2015-Ohio-4165.]

STATE OF OHIO       )               IN THE COURT OF APPEALS
                      )ss:           NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT    )

IN RE: N.L.                          C.A. No.     27784

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    DN13-01-0057

DECISION AND JOURNAL ENTRY

Dated: October 7, 2015

MOORE, Judge.

{¶1} Appellant, Tina J., ("Mother") appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her minor child, N.L., and placed the child in the permanent custody of Summit County Children Services ("CSB"). This Court affirms.

I.

{¶2} Appellant and Glen L. ("Father") are the unmarried parents of N.L., born May 27, 2011. Father participated in the proceedings below, but has not appealed.

{¶3} The evidence adduced at the hearing demonstrates that both parents have limited cognitive abilities. Mother was diagnosed as having a mild intellectual disability, described as placing her below the "borderline" category in functioning. In addition, Mother was diagnosed with a social anxiety disorder that causes her to experience anxiety when meeting new people or

confronting large groups of people. Her parenting evaluation revealed that she has a low frustration tolerance and has difficulty with short term memory.

{¶4} Mother has been receiving case management services through the Summit County Board of Developmental Disabilities ("SCDD") for at least ten years and well before N.L. was born. At the time of the permanent custody hearing, Mother was receiving in-home assistance 20-24 hours a week. The aide helped Mother with independent living skills such as cooking, hygiene, housekeeping, grocery shopping, budgeting, using a calendar, making appointments, and transportation. Mother receives Social Security Disability Insurance and has a payee to help her manage her money. Mother, who was 43 when N.L. was born, also has an adult son. She lived with and had the assistance of her own parents in raising him.

{¶5} In regard to Father, the record reflects that he was diagnosed with an IQ of 56, falling into the lowest category on the Wechsler Adult Intelligence Scale, and he was described as being mildly mentally retarded.[1] Father was also diagnosed with a generalized anxiety disorder and antisocial personality traits. Those traits were said to include poor judgment and poor insight. His parenting evaluation revealed that he has difficulty with memory and chronology and lacks almost all parenting knowledge. The evaluating psychologist testified that Father lacks the ability to live independently, use or budget money, effectively communicate or functionally read or write. He receives Social Security Disability Insurance and has a payee to handle his finances.

---

[1] The United States Supreme Court has recently chosen to substitute the term "intellectual disability" for "mental retardation." *Hall v. Florida*, ___ U.S. ___, 134 S.Ct. 1986, 1990 (2014). While this Court agrees that sensitivity is due in any discussion of mental disabilities, the Ohio Revised Code and the psychologist who evaluated Father use the term "mentally retarded." Thus, for accuracy, this Court uses that term where the Revised Code and the record have done so, but no pejorative connotation from such use is intended.

{¶6}  Mother and Father met one another through their participation in a jobs program at Goodwill Industries.  There is no evidence that Father ever lived with Mother or with N.L.  N.L. was born prematurely at 31 weeks, and the infant remained in the neonatal intensive care unit ("NICU") of the hospital for three months after her birth to address medical issues.  Upon N.L.'s discharge from the hospital to Mother, the child required follow-up appointments with a nephrologist, an ophthalmologist, a dietician, and a therapist.  At some point, CSB became aware that Mother was not following through with N.L.'s medical care and initiated a "safety plan."  At approximately that same time, Mother engaged in a parenting program at Pregnancy Cares.

{¶7}  By July 2012, CSB established a voluntary case plan with the parents.  Through that plan, CSB referred Mother to Fast Track, a 90-day program that helps families improve stability, increase functioning, and maintain their children in their homes.  Fast Track provided Mother with in-home services for several hours a day several times a week.  Providers helped Mother develop schedules, take N.L. to medical appointments, make grocery lists, manage a budget, use a calendar, follow diets, and address safety concerns and parenting skills.  Mother was not successful in completing the program, however, and CSB requested that the agency provide Mother with an additional 90-days of service.

{¶8}  After six months of Fast Track services, Mother still had difficulty providing care for N.L. without significant help from aides.  The Fast Track case manager did not believe that Mother had a good understanding of how to schedule appointments, get prescriptions filled or correctly administer medications, comply with N.L.'s special diet, or remember which doctor or specialist was for which need.  She stated that Mother often seemed frustrated or impatient with N.L. and was overwhelmed with all the responsibilities of caring for her.  She explained that Mother did not listen to the information from medical personnel at appointments, but rather just

played with N.L. In addition, N.L.'s doctors were concerned that the child was losing weight while in Mother's care.

{¶9} There was also evidence before the trial court that Mother would occasionally express frustration or a sense of being overwhelmed with caring for the child, begin to cry, and tell the caseworker that she could not take care of N.L. by herself. Sometimes, when she felt overwhelmed, Mother contacted Father to take the child for a few days. On one of those occasions, Mother left N.L. with Father, but gave Father no food or supplies, and he had no resources to provide for the child at that time.

{¶10} Given the continuing concerns about Mother's ability to meet the child's needs, the agency scheduled a family team meeting in hopes of locating a relative placement for N.L. A maternal aunt was determined to be acceptable and was willing to assume custody of N.L. Accordingly, on January 17, 2013, CSB initiated a dependency action in juvenile court. The court granted emergency temporary custody to the aunt with protective supervision in CSB. After N.L. was placed with the aunt, she began to gain weight.

{¶11} In April 2013, the matter proceeded to adjudication and disposition before a magistrate at which time the parties stipulated to an amended version of the complaint. On that basis, the magistrate found the child to be dependent and continued N.L. in the temporary custody of the aunt with protective supervision in CSB. The trial court adopted the decisions of the magistrate regarding adjudication, disposition, and adoption of the case plan without objection by the parents.

{¶12} Mother's case plan required her, first, to demonstrate that she understood N.L.'s medical needs and was able to follow-up with her medical care without the consistent support of aides. In so doing, Mother was to attend all of N.L.'s scheduled medical appointments, create a

transportation plan for N.L.'s appointments and emergency needs, give N.L. her medications as prescribed, and be involved in support services that contribute to her well-being. Second, Mother was to regularly attend visitation, maintain stable housing, and demonstrate appropriate parenting skills. Many of Mother's visits were scheduled twice a week for several hours each and in her home, which allowed Mother to prepare meals for N.L. Father's case plan required him to attend weekly supervised visits and obtain counseling. Later, the case plan was amended to require both parents to complete psychological assessments with a parenting focus and to follow the resulting recommendations. Mother's recommendations included individual counseling, continuing support from SCDD, and in-home parenting education. Father's recommendations included counseling and parenting classes.

{¶13} SCDD continued to provide services to N.L. for about six months while she was in the custody of her aunt and then the foster family. The developmental specialist from that agency testified that N.L. made significant progress during that time, emphasizing that her progress was greatly aided by the fact that the caregivers followed through with practicing skills taught during sessions. Although N.L. did well in the custody of her aunt, the CSB caseworker testified that the aunt suffered a breakdown and was hospitalized in September 2013. Consequently, N.L. was transferred to the temporary custody of the agency and placed in a foster home at that time.

{¶14} On June 23, 2014, CSB filed a motion for the permanent custody of N.L. Following a hearing, the trial court terminated the parents' parental rights and granted permanent custody of the child to CSB. Mother has appealed and has assigned four errors for review. The first, second, and third assignments of error will be considered together because they are related.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN FINDING IT IS IN THE MINOR CHILD'S BEST INTEREST THAT SHE BE PLACED IN THE PERMANENT CUSTODY OF SUMMIT COUNTY CHILDREN [SERVICES] AS THE PROSECUTION FAILED TO MEET ITS BURDEN OF PROOF AND THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN GRANTING [PERMANENT] CUSTODY OF THE MINOR CHILD TO SUMMIT COUNTY CHILDREN SERVICES AS MOTHER HAD SUBSTANTIALLY COMPLETED HER CASE PLAN.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED AS A MATTER OF LAW IN GRANTING PERMANENT CUSTODY OF THE MINOR CHILD TO SUMMIT COUNTY CHILDREN SERVICES WHEN SUMMIT COUNTY CHILDREN SERVICES BOARD DID NOT USE REASONABLE CASE PLANNING AND DILIGENT EFFORTS FOR REUNIFICATION WITH THE MOTHER.

{¶15} In her first assignment of error, Mother contends that the judgment of the trial court granting permanent custody of N.L. to CSB is against the weight of the evidence. In her second assignment of error, Mother claims that the trial court erred in granting permanent custody to CSB because she had substantially completed her case plan. In her third assignment of error, Mother claims the trial court erred in granting permanent custody because the agency did not engage in reasonable case planning and diligent efforts. Upon review, this Court concludes that there is no merit in these assigned errors.

{¶16} R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody to a public services agency. The statute requires the court to find, by clear and convincing evidence, that: (1) one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) apply, and (2) permanent custody is in the best

interest of the child. R.C. 2151.414(B)(1). Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶17} When evaluating whether a judgment is against the manifest weight of the evidence, this Court reviews the entire record, "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered. (Internal quotations and citations omitted.) *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. In so doing, "every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Id.* at ¶ 21. The Ohio Supreme Court has made it clear that this standard applies in civil cases as well as in criminal cases. *Id.* at ¶ 17. Accordingly, this Court applies the same standard in determining whether a trial court judgment in permanent custody cases is against the weight of the evidence.

{¶18} The trial court found that the first prong of the test was satisfied because the child could not be returned to either parent within a reasonable period of time or should not be returned to their care. The trial court made two determinations in support of that finding. It determined, first, that the parents failed to remedy the conditions that brought N.L. into care and, second, that the parents' developmental disabilities/mental retardation are so severe that neither parent is able to provide N.L. with an adequate permanent home. *See* R.C. 2151.414(E)(1) and R.C. 2151.414(E)(2).

{¶19} Within her argument in support of the first assignment of error, Mother generally claims that the first prong of the permanent custody test was not satisfied by the evidence. In making this argument, she primarily relies on *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, for the proposition that the termination of parental rights may not be based on a parent's cognitive abilities alone. The specific holding of *In re D.A.* is that a trial court may not base its decision regarding the second prong best interest finding solely on the limited cognitive abilities of the parents. *Id.* at syllabus. The high court also considered the effect of a parent's mental retardation in regard to a first prong finding that a child cannot be placed with a parent within a reasonable time or should not be placed with a parent. *Id.* at ¶ 25.

{¶20} Although the trial court in *In re D.A.* focused on the parents' limited cognitive abilities, it did not find that the parents were unable to provide an adequate home for their child due to their mental retardation, as did the trial court in the present case. *See id.* at ¶ 33. Nor did the evidence in *In re D.A.* demonstrate that the parents failed to provide the child with an adequate permanent home, in that there was no evidence that he lacked clothing, food, shelter, or care. *Id.* The high court concluded that there was a lack of clear and convincing evidence in that case that the parents' limited abilities caused or threatened to cause harm to the child. *Id.* at ¶ 39.

{¶21} In the present case, the trial court did not rely solely on the parents' cognitive abilities in granting permanent custody to CSB, as prohibited by the Supreme Court in *In re D.A.* Rather, the evidence in this case illustrates a link between the limited cognitive abilities of the parents and their abilities to remedy the problems identified by CSB and to provide an adequate permanent home for the child. *See In re Robinson*, 3d Dist. Allen No. 1-08-24, 2008-Ohio-5311, ¶ 37 (distinguishing *In re D.A.* based on a lack of evidence linking the parents' limited cognitive abilities to their abilities to provide an adequate permanent home for their child). Particularly as

to Mother, her cognitive limitations appear to have contributed to her inability to provide a safe and healthy home for N.L. in which her needs may be met, and Mother showed little ability to remedy those problems even with substantial support services. Moreover, as the discussion below demonstrates, the trial court relied on more than the parents' limited cognitive abilities in identifying deficits. Thus, unlike *In re D.A.*, the parents' cognitive limitations were not the sole basis for the trial court's conclusions, but rather there was "objective evidence [] to show that the statute was satisfied." *In re D.A.*, at ¶ 37. "[A]lthough the trial court may not terminate parental rights solely based upon limited cognitive abilities, it is a factor that may be considered." *In re Cunningham Children*, 3d Dist. Seneca Nos. 13-08-27, 13-08-28, 13-08-29, and 13-08-30, 2008-Ohio-5938, ¶ 13. Because the trial court did not rely solely on the parents' limited cognitive abilities in granting permanent custody to CSB, the decision in *In re D.A.* does not bar that result.

First prong of the permanent custody test

{¶22} While N.L. was in the NICU, she received medical treatment for being born with small kidneys, among other conditions. Following her release from the hospital, she entered the care of a pediatric nephrologist. That doctor found that N.L. had developed either a kidney stone or calcifications in her kidneys. He explained that calcifications can develop from medications given to a child who is in NICU for a long period of time. In January 2013, the child had a surgical procedure, to attempt to break up the object with shock waves. The procedure was partly successful. Thereafter, because N.L. had no symptoms or pain and had a normal kidney function, the specialist treated N.L. by recommending a special diet meant to prevent the object from increasing in size. He prescribed increased fluids, low sodium (2000 mg. a day), and limited calcium in her diet. N.L. was also to increase her caloric intake and be seen by a dietician. The nephrologist cautioned that occasional high sodium foods may not negatively

affect the child's health, but it was important to follow the prescribed diet overall to avoid the object growing, causing pain, bleeding in urine, causing blockage, or infection in the kidneys.

{¶23} In addition to ongoing appointments with the nephrologist, Mother and N.L. met with a dietician at least 15 times. At those appointments, Mother was repeatedly advised on ways to increase N.L.'s caloric intake, limit sodium and calcium, avoid processed foods, and provide balanced meals. The dietician created sample menus for Mother, and also provided her with handouts of foods that were advised and those that were not advised. The caseworker gave Mother a list of acceptable foods as well. The dietician gave Mother homework assignments, including a request that she bring in pictures of foods, but Mother rarely completed the assignments. The dietician emphasized that N.L.'s diet is a "high priority" in terms of the child's health. Nevertheless, several service providers testified that Mother continued to feed high-sodium and processed foods such as chicken nuggets, macaroni and cheese, and pizza nuggets to N.L. during her visits in Mother's home. Mother was also observed giving too much milk to N.L., counter to her prescribed diet.

{¶24} More than Mother merely failing to follow the diet, the record reflects that she was simply not able to understand how to implement the diet and had difficulty remembering the dietary limits themselves. While Mother could locate the sodium content on food labels, she was not able to interpret that information and place it into an overall dietary plan. The psychologist explained that Mother was able to identify if a food item contained sodium, but was not able to determine if it was too much and should not be given to N.L. The dietician explained that Mother also had difficulty understanding measurements, a matter of some concern in terms of diet as well as the administration of medications. Several service providers observed that Mother

had difficulty saying "no" to N.L. and often gave her foods she liked although they were prohibited by her diet.

{¶25} Mother received numerous services while N.L. was still in her care. She completed a traditional parenting program and two 90-day sessions of Fast Track. At Mother's request, Help Me Grow also came into her home to provide services. Mother participated in individual counseling sessions and was receiving case management services through SCDD based on her disabilities. SCDD provided Mother with 20-24 hours of in-home services weekly to help her learn to meet the daily needs of her daughter. The aide helped Mother with shopping, making appointments, transportation, creating weekly menus, and provided guidance on cooking and child care. Mother came to rely on this aide for much of her decision-making and, according to the guardian ad litem, frequently responded to questions by saying that she had to ask her aide. SCDD provided services to N.L. as well, based on her delays in motor skills and speech.

{¶26} After N.L. was removed from Mother's home, Mother continued attending individual counseling sessions, which addressed her anxiety disorder and the incorporation of parenting skills and other life skills into her daily routine. Mother continued to receive in-home case management services through SCDD. Mother also received practical guidance from the supervisors of her in-home visits with her daughter. In addition, CSB referred Mother to a 16-week intensive parent-child program through Northeast Ohio Behavioral Health ("NEOBH"). That program included one hour of one-on-one interaction between the counselor and the parent, which was followed by a second hour that included the child. The program focused on parenting tasks, including recommendations made by medical professionals or providers. In this case, the focus was on the specialized care of N.L. to see if Mother could functionally accomplish the care she required.

{¶27} The clinical counselor who conducted this intensive program identified Mother's strengths as her ability to bond with N.L., her desire to learn, and her willingness to participate. While Mother was willing to learn, she often did not listen to instructions, could not recall what was said, and posed no questions regarding the material presented to her. The counselor was most concerned with Mother's inability to process new information, recall it, and put it into practice. She expressed concern that this would affect Mother's parenting, particularly given N.L.'s medical issues and as the child grows. When the counselor asked Mother what she learned at recent medical appointments, Mother was unable to recall anything. The counselor testified that Mother could not recall material from the beginning of a session to the end, even when Mother was alerted to the questions that would be asked. After eight weeks, Mother was discharged from the program because the provider determined that it was unable to help Mother safely parent her child unless there was a responsible adult in the home to assist her. The counselor testified that she could not see that Mother gained anything from the sessions. At CSB's urging, Mother was given a second chance in the program. Mother scheduled two more appointments and assured the agency that she had transportation, but did not show up for either appointment, later explaining that she did not have a ride. Mother was discharged from the program once again.

{¶28} In addition, Mother experienced symptoms of her anxiety disorder, for which she was undergoing individual counseling. The disorder came into play when Mother was around strangers or large groups of people and, of particular concern here, caused her to be unable to ride public buses. She was instructed on using SCAT transportation services whenever she was able to provide 24-hour notice. Mother had no alternative plans for transportation and stated that she would not utilize Father, though he is able to drive.

{¶29} There was evidence before the trial court that both parents got distracted while watching N.L., thus creating a risk to her safety. For example, Mother nearly let N.L. fall off the open edge of a porch. Mother's attorney has responded to this issue by proposing the elimination of safety hazards from Mother's home. While that may be helpful, it is not a realistic solution for every potential danger faced by a young child and cannot compensate for the supervision that all young children require.

{¶30} Father clearly loves N.L. and stated that he would like to have custody of N.L. However, he also recognized that he would not be ready for that until he cleared up his credit card debt, obtained independent housing, and expunged his legal record, which he estimated would take five years.

{¶31} Although Mother is able to have aides in her home through SCDD multiple hours a week and could be eligible for services close to 40 hours per week, it is clear that aides are not able to be present 24 hours a day and seven days a week. Neither parent has demonstrated the ability to provide safe and appropriate care for their child without consistently relying on the assistance and judgment of others. Mother and Father have thus failed continuously and repeatedly to substantially remedy the conditions that caused the removal of the child from the home. Accordingly, this portion of the statutory requirement of R.C. 2151.414(E)(1) is satisfied.

Reasonable case planning and diligent efforts

{¶32} Satisfaction of the predicate portion of R.C. 2151.414(E)(1) is also necessary in order to support a first prong finding that the child cannot or should not be placed with a parent. *See* R.C. 2151.414(E). That portion of the statute requires that the agency must have engaged in reasonable case planning and diligent efforts for reunification, and it is challenged through Mother's third assignment of error, which we now address.

{¶33} Mother cites two matters in an effort to demonstrate error in this regard: (1) Dietary directions should have been provided to Mother through visual aids as opposed to verbal instructions so as to have been better understood by her and (2) CSB substituted an intensive parenting program for the in-home parenting that was recommended by the evaluating psychologist.[2] We have not located any objection by Mother to these matters in the trial court record and Mother has not provided a reference to any such objections in her appellate brief. A party may not object to matters regarding case plan implementation for the first time on appeal. *See In re M.Z.,* 9th Dist. Lorain No. 11CA010104, 2012-Ohio-3194, ¶ 18. Such matters should be brought to the attention of the trial court at a time when they might be addressed. *See In re H.W.*, 9th Dist. Summit No. 27730, 2015-Ohio-3018, ¶ 10.

{¶34} Mother also cites R.C. 2151.419(A) within her supporting argument. The requirements of that statute do not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413. *In re C.F.*, 113 Ohio St.3d 73, 81, 2007-Ohio-1104, ¶ 43. Consequently, Mother's third assignment of error is without merit.

Substantial compliance with the case plan

{¶35} Through Mother's second assignment of error, she contends that permanent custody was erroneously granted because she had substantially complied with her case plan requirements. We must emphasize once again that substantial compliance with a case plan, in and of itself,

---

[2] While this argument has been forfeited by Mother, we do not wish to imply that we sanction the modification of the case plan by CSB without following proper amendment procedures. The agency substituted an intensive parenting program for the in-home parenting services recommended by the psychologist. It apparently did so because N.L. was not in Mother's custody at the time. Although this substitution may have been a reasonable accommodation, as we have previously emphasized, a caseworker may not independently impose amendments to a parent's case plan. *In re S.D-M.*, 9th Dist. Summit Nos. 27148, 27149, 2014-Ohio-1501, ¶ 26. Rather, a children services agency must comply with the procedures of R.C. 2151.42 if it seeks to amend a case plan. *See In re S.D-M.* at ¶ 26. Otherwise, not only the parents, but also the agency, are bound by the existing case plan.

does not establish that a grant of permanent custody to an agency is erroneous. *See, e.g., In re Watkins v. Harris*, 9th Dist. Summit No. 17068, 1995 WL 513118, *4 (Aug. 30, 1995). Rather, the termination of parental rights is governed by the provisions of R.C. 2151.414. As this case has developed, that essentially requires a determination of whether N.L. can or should be placed with Mother within a reasonable time, and in particular, whether Mother has remedied the problems that caused N.L. to be removed from her home or whether Mother is able to provide an adequate permanent home for the child. *See* R.C. 2151.414(B)(1)(a), R.C. 2151.414(E)(1), and R.C. 2151.414(E)(2). It also requires a determination of whether permanent custody is in the best interest of the child. *See* R.C. 2151.414(D)(1).

{¶36} Those questions are not fully addressed by a determination of whether Mother substantially complied with a case plan. Although Mother has attended visits, has received the assistance of multiple service providers, and has attended N.L.'s medical appointments, Mother has nevertheless failed to demonstrate that she has remedied the problems that caused N.L. to be removed from her home or that she can provide an adequate permanent home for the child. Mother has not been able to demonstrate that she understands N.L.'s medical needs or that she is able to follow-up with the child's medical care, arrange for transportation to N.L.'s appointments and for emergency situations, or demonstrate the ability to provide for N.L.'s needs without the consistent help of a provider in her home. Mother's second assignment of error is therefore without merit.

First prong conclusion

{¶37} In considering whether Mother remedied the problems that caused the child's removal from the home, the trial court clearly considered Mother's limited cognitive abilities in making its decision, but her abilities were not the only evidence before the court. Rather

Mother's cognitive abilities were linked to her inability to remedy the conditions that caused the removal of the child and her inability to provide an adequate permanent home for her child. Moreover, that was not the only factor considered by the trial court. Mother has often been unable to demonstrate that she can focus on and understand instructions from medical personnel. In fact, she failed to listen to medical information and directions and played with her daughter during appointments instead. Mother has difficulty with short term memory. She has not demonstrated an ability to recall and process instructions so that she might apply them going forward. Mother could not keep track of appointments and consistently called the caseworker to confirm appointments that had previously been made. Mother also had difficulty making decisions herself and would frequently seek and rely upon the advice of her SCDD case manager instead. Mother suffers from an anxiety disorder, causing her to be unable to use public bus transportation and complicating her ability to get N.L. to her appointments or deal with emergency situations. Mother and Father are both prone to become distracted while watching N.L. These deficits create significant health and safety risks to N.L. Mother has not demonstrated that the trial court erred in finding that, despite reasonable case planning and diligent efforts by the agency, the parents have continuously and repeatedly failed to substantially remedy the problems initially causing the child to be placed outside the home. *See* R.C. 2151.414(E)(1). This Court concludes that the first prong of the permanent custody test has been satisfied. Having determined that the evidence supports the trial court finding under R.C. 2151.414(E)(1), it is not necessary for this Court to also consider the finding under R.C. 2151.414(E)(2).

Second prong of the permanent custody test

{¶38} In regard to the second prong of the permanent custody test, the trial court found that granting permanent custody to CSB was in the best interest of N.L. When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.414(D): the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, and the child's need for permanence in his life. *See In re R.G.*, 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11. "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith*, 9th Dist. Summit No. 20711, 2002 WL 5178, *3 (Jan. 2, 2002); *see also In re Palladino*, 11th Dist. Geauga No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.

{¶39} It is not disputed that N.L. and Mother have a loving relationship. They are always excited to see each other at visits and at appointments. It is also clear that Father loves N.L. and that he would like to continue a relationship with her even if permanent custody is granted.

{¶40} While under Mother's care, however, N.L. fell behind in her immunizations, was not taken to follow-up medical appointments, and exhibited a weight loss. Despite the significant assistance provided to her, Mother has not demonstrated that she can absorb, comprehend, and implement the medical directions given to her during the child's appointments.

{¶41} Mother also demonstrated an inability to perform tasks that are critical to the role of a parent, as opposed to that of a playmate or a friend. There was evidence before the trial court that Mother did not want to schedule medical appointments for immunizations because they were hurtful to N.L.; that Mother did not want to discipline N.L. and did not see that as her

role; that she fed N.L. the proscribed chicken nuggets and macaroni and cheese simply because N.L. liked those foods; that she interacted with N.L. as a child as opposed to a parent; and that she did not listen to information from medical personnel at medical appointments, but rather played with N.L. instead. The service coordinator from Help Me Grow testified that while Mother had good bonding with N.L., she was concerned that Mother would hold N.L. back from developing appropriately because Mother enjoyed her being a baby. This sort of behavior has a direct impact on the health, safety, and well-being of a child and reflects negatively on Mother's relationship with her child.

{¶42} By the age of three, N.L. had started walking and was using some words. She was interacting well with her foster family, including the three other children in that home. The foster mother testified that she has a very good relationship with Mother and found Mother to be very loving with N.L. She said that Father also shows a genuine interest in and loves his child. She explained that she is considering adoption, but would be willing to continue to allow contact between N.L. and her parents, and, in fact, "would seek it absolutely." In turn, she said her family would like to be part of N.L.'s life even if permanent custody is not granted.

{¶43} The CSB supervisor, Steven Bodey, addressed the fact that Mother had received a number of hands-on services that are usually successful with people with developmental disabilities, yet they were unsuccessful with Mother. Mother had received 180 days of in-home services through the Fast Track program that worked with Mother on developing schedules, keeping appointments, learning to strategize, and following N.L.'s diet. Mother also received services through the intensive parenting program from NEOBH, which focused on N.L.'s specialized medical care. Neither of those programs was successful. In addition, SCDD provided Mother with 20-24 hours per week of services directed to independent living skills.

That program, too, was not as successful as hoped. Mr. Bodey noted that, even after all of these services, most of which are at an enhanced level, there was minimal progress by Mother and no progress in understanding N.L.'s diet. He testified that he was not aware of any other parenting programs that would be more intensive or provide a higher level of service to Mother. Mr. Bodey added that there is no doubt that both parents love N.L.

{¶44} Bathsheba Phillips, as the guardian ad litem for this young child, recommended that permanent custody be granted to CSB.

{¶45} The custodial history of N.L. reflects that upon her release from the hospital at three months of age, she resided in Mother's home for 16 months. During that time, CSB engaged with Mother and N.L. through a "safety plan" as well as on a "voluntary case." When CSB filed its court case, N.L. was placed with a maternal aunt under the protective supervision of the agency. After nine months, the court granted temporary custody to the agency and placed N.L. with a foster family. The child remained with the foster family for approximately 18 months until the permanent custody hearing.

{¶46} Neither parent is able to meet N.L.'s needs nor has any relative come forward to provide long-term care for the child. The CSB caseworker testified that Mother is very loving with N.L., but she believes that permanent custody is in the child's best interest. She expressed concern that Mother had not been able to understand and implement N.L.'s dietary needs and was also concerned that Mother would be able to get N.L. to school and to her medical appointments despite the numerous efforts made to assist her and the services made available to her. She observed that Mother sometimes gets distracted and fails to notice a safety risk to the child. Finally, she noted that she had not heard Mother ask any questions of medical providers during appointments.

**{¶47}** There were two guardians ad litem appointed to represent N.L. during this case and both testified at the permanent custody hearing. Rhea Marcinko, the first guardian ad litem appointed to the case, testified that both parents love N.L., but both have gotten distracted while watching N.L. She believes that Mother did not follow N.L.'s prescribed diet and observed that there was little food in Mother's home that did not have a great deal of sodium in it. She expressed concern that Mother seemed to understand the directions from medical providers initially, but was unable to follow through with them.

**{¶48}** Bathsheba Phillips, the second guardian ad litem, similarly reported that Mother is very loving, but lacks the skill to be a successful parent to N.L. She cited Mother's transportation difficulties, short attention span, poor recall of instructions, and inappropriate food for N.L. She believes Mother cannot independently care for N.L. and cannot make appropriate parenting decisions without guidance from others. She also found that Father's cognitive disability impedes his ability to retain the knowledge needed to care for a young child. The guardian ad item believes Father would just like N.L. to be happy and to have a continuing relationship with her. The weight of the evidence supports the second prong finding that permanent custody is in the best interest of the child.

**{¶49}** The trial court reasonably concluded, based on clear and convincing evidence, that the child cannot be placed with either parent within a reasonable time or should not be placed with them and that granting permanent custody to CSB was in the child's best interests. The record does not demonstrate that the trial court clearly lost its way and created a manifest miscarriage of justice when it terminated the parents' parental rights and granted permanent custody of N.L. to CSB. *See Eastley,* 132 Ohio St.3d 328, 2012-Ohio-2179, at ¶ 20. Mother's first assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT VIOLATED MOTHER'S FUNDAMENTAL RIGHT TO RAISE HER CHILD WHEN THEY GRANTED PERMANENT CUSTODY TO SUMMIT COUNTY CHILDREN SERVICES.

{¶50} Many of the arguments raised by Mother in her discussion of this assignment of error have already been addressed in our response to the other assigned errors. We will address the remaining points here.

{¶51} To the extent that Mother challenges the trial court order on broad constitutional grounds, Mother is barred from bringing such a challenge on appeal due to her lack of objection in the trial court. This Court need not reach constitutional challenges that were not timely raised before the trial court. *See In re O.T.*, 9th Dist. Summit No. 24403, 2009-Ohio-1055, ¶ 12, citing *State v. Awan*, 22 Ohio St.3d 120 (1986), syllabus.

{¶52} Mother appears to challenge the validity of the adjudicatory finding of dependency. That finding is not subject to readjudication where CSB has sought permanent custody of the child. *See In re H.F.*, 120 Ohio St.3d 499, 2008-Ohio-6810, ¶ 15. "[A]n order adjudicating a child abused, neglected, and dependent, and awarding temporary custody of the child to a children-services agency, [is] a final order pursuant to R.C. 2505.02, that had to be appealed by the child's parent within 30 days of the order." *In re C.B.*, 129 Ohio St.3d 231, 2011-Ohio-2899, ¶ 11, citing *In re H.F.* at ¶ 9. Moreover, Mother stipulated to the complaint, as amended, and waived hearing at adjudication. She cannot now challenge the finding of dependency.

{¶53} Mother also challenges the constitutionality of R.C. 2151.414(B)(1)(d). This argument is unavailing because the trial court did not rely on this ground in granting permanent

custody. Finding no merit in any of Mother's arguments, the fourth assignment of error is overruled.

## III.

{¶54} Mother's four assignments of error are overruled. The judgment of the Summit County Court of Appeals, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

CARR, P. J.
WHITMORE, J.
CONCUR.

APPEARANCES:

JASON D. WALLACE, Attorney at Law, for Appellant.

MICHAEL E. GEORGE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.

LINDA BENNETT, Guardian ad litem.