[Cite as *In re M.S.*, 2022-Ohio-3348.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

|  |  |  |
|---|---|---|
| IN RE: M.S. and K.B | : | |
| | : | |
| | : | Appellate Case No. 29441 |
| | : | |
| | : | Trial Court Case Nos. G-2018-004061-0F,0I and G-2019-002912-0F,0I |
| | : | |
| | : | (Appeal from Common Pleas Court-Juvenile Division) |
| | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 23rd day of September, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0097348, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee, Montgomery County Children Services

TRAVIS KANE, Atty. Reg. No. 0088191, 130 West Second Street, Suite 460, Dayton, Ohio 45402
        Attorney for Defendant-Appellant, Father

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Father appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which awarded legal custody of his children to their paternal grandmother. In support of his appeal, Father contends that the decision to award legal custody to paternal grandmother was not in the best interest of his children. Based on our review of the record, we see no abuse of discretion in the trial court's ruling. Accordingly, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} Father is the biological father of siblings M.S. and K.B., who are currently nine and seven years old. Before Montgomery County Children Services ("MCCS") became involved with the children, M.S. was in the custody of Father and K.B. was in the custody of the children's biological mother ("Mother").

{¶ 3} On August 15, 2018, MCCS filed a dependency complaint regarding M.S. when he was five years old, due to concerns of physical abuse occurring at his home. At the time the complaint was filed, M.S. was living with Father and Father's girlfriend, D.K., and with D.K.'s child, S.K. The complaint was filed because MCCS learned that D.K. and Father hit S.K. with a belt as a form of discipline. MCCS became aware of this information after S.K. presented at the hospital with linear bruising on her body. During MCCS's investigation of the matter, M.S. reported that both Father and D.K. had hit him with a belt as well. After the dependency complaint was filed, M.S. was placed in the temporary custody of his paternal grandmother, S.G., as the whereabouts of M.S.'s mother was unknown. On October 5, 2018, the trial court adjudicated M.S. a dependent

child and ordered M.S. to remain in the temporary custody of S.G.

{¶ 4} As for K.B., on July 18, 2018, K.B. was placed in the emergency custody of the Oklahoma Department of Human Services ("ODHS") when she was just under three years old. ODHS obtained emergency custody due to Mother's abandoning K.B. and K.B.'s half-sibling, A.B., at a family friend's house. On March 11, 2019, the District Court of Tulsa County adjudicated K.B. and A.B. as deprived children and awarded ODHS temporary custody of the children. Because it was later determined that K.B.'s mother and father resided in Montgomery County, Ohio, the District Court of Tulsa County made contact with Montgomery County's Juvenile Court Division in order to discuss transferring jurisdiction of the matter per the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"). After the courts discussed the matter, the District Court of Tulsa County filed an order transferring jurisdiction to the trial court herein. The trial court accepted jurisdiction pursuant to the UCCJEA and then granted temporary custody of K.B. and A.B. to MCCS and then to S.G.

{¶ 5} On June 28, 2019, and July 30, 2019, MCCS filed motions for M.S. and K.B. to be placed in the legal custody of S.G. On October 9, 2019, the trial court awarded S.G. legal custody of the children's half-sibling, A.B. Thereafter, on December 13, 2019, and June 8, 2020, MCCS filed additional motions requesting that the trial court award S.G. legal custody of M.S. and K.B.

{¶ 6} The trial court held hearings on the legal custody motions on March 10 and 22, 2021. The witnesses who testified at the hearings were S.G., MCCS caseworker Deja Williams, Mother, and Father. Because Father wants custody of the children and

is the only party appealing from the trial court's legal custody determination, we will only discuss the testimony that is relevant to Father's appeal. The following is a summary of the relevant testimony of each witness.

*S.G.'s Testimony*

{¶ 7} S.G. is the paternal grandmother of M.S. and K.B. According to S.G., M.S. and K.B. refer to her as "Mama." Hearing Tr., Vol. I, p. 31. S.G. testified that in addition to caring for M.S. and K.B., she and her husband care for four other children. Those children include A.B. (of whom S.G. received legal custody in October 2019), S.G.'s two teenage stepsons, and S.G.'s maternal grandson. S.G. testified that her husband is a truck driver who owns his own company and that they have sufficient income to provide for all the children's needs. S.G. described her home as a three-bedroom trailer containing bunk-bed sets so that each child has his or her own bed. S.G. also testified that MCCS conducted and approved a home study at her residence.

{¶ 8} With regard to M.S. and K.B., S.G. testified that both children were doing great in school. According to S.G., the children were on target with their grade level and were not on individualized education plans. S.G. indicated that M.S. and K.B. were not up to date on their vaccinations and medical/dental appointments when they first came into her care, but that she had since been able to bring them up to date on everything. S.G. further testified that she had taken M.S. and K.B. to Butler County Behavioral Services, where counselors advised her that the children did not have any issues that required counseling. S.G., however, testified that the children did have occasional talks

with their school counselor, and that the school counselor had told S.G. that she could schedule counseling sessions in the future to make sure that the children continued to do well.

{¶ 9} Continuing, S.G. testified that Father and Mother are deaf and that, in 2020, she was ordered by the court to have M.S. and K.B. attend American Sign Language ("ASL") classes. S.G. testified that enrollment in the classes was to be handled by MCCS and that the agency had referred her to multiple places that could not offer classes due to the COVID-19 pandemic and due to the children's ages. S.G. testified that she was then taking a remote ASL class for adults via Zoom, during which the children sat and learned sign language with her.

{¶ 10} With regard to visitation, S.G. testified that she had and would continue to have an open-door policy when it came to Father's and Mother's visiting the children in her home. S.G. testified that Father's visits had been inconsistent and, until recently, Father had only been interested in visiting M.S. S.G. testified that Father treated M.S. like an only child and that Father had just started interacting with K.B. in the previous four or five months. As a result, S.G. testified that K.B. was not as close to Father as M.S.

{¶ 11} S.G. also testified that Father brought his girlfriend, D.K., when he visited the children. S.G. testified that she had no problem with D.K.'s being at the visits as long as there was no controversy between D.K. and Father. S.G. testified that just a few weeks before the custody hearing, she had had to kick Father and D.K. out of her home during a visit due to Father's physically abusing D.K. in front of the children. S.G. testified that the children told her that D.K. had called one of the children a "bitch" and that Father

had punched and kicked D.K. for speaking to the children in such a manner. S.G. testified that, although she did not witness the incident herself, she observed that D.K.'s tooth had been chipped and that the bridge of D.K.'s nose was bleeding and swollen. S.G. reported the incident to MCCS and to the police, but D.K. did not press any charges against Father. S.G. testified that D.K. and Father were still in a relationship and that D.K. showed no interest in M.S. or K.B. S.G. also testified that D.K. had had her own child taken away by MCCS.

{¶ 12} In addition to Father's hitting D.K., S.G. testified that Father had hit her on three occasions. S.G. testified that the third time Father hit her, she decided to report the incident to the police and to press charges against Father. As a result, S.G. testified that Father had a warrant for his arrest at the time of the hearing. When asked to describe Father's temperament, S.G. testified that Father got mad when he did not get his way and that "he flew off the handle" when she asked him how he planned on getting his children back. Hearing Tr., Vol. I, p. 78.

*Deja Williams's Testimony*

{¶ 13} Deja Williams was the MCCS caseworker assigned to M.S.'s and K.B.'s cases. Williams testified that S.G. had cared for M.S. since March 2018 and K.B. since July 2019. Williams also confirmed that S.G. had legal custody of M.S. and K.B.'s half sibling, A.B. Williams testified that both M.S. and K.B. had told her that they would like to continue living at S.G.'s house, where they can still have visits with Father and their older half-sibling.

**{¶ 14}** Williams testified that she had no concerns with S.G.'s home; she had visited the home and conducted a home study, which was approved. According to Williams, S.G.'s home was appropriate, clean, and had sufficient space and beds for all the children. Williams also testified that there was always food in the house and that S.G. and her husband had the financial means to provide for all the children.

**{¶ 15}** Continuing, Williams testified that neither child had any special medical needs and that S.G. kept her up to date on when the children had medical or dental appointments. Williams testified that, in 2020, the trial court had ordered M.S. and K.B. to take ASL classes and that she had worked on trying to get the children enrolled in a sign language program. Specifically, Williams testified that she had registered the children for a private tutoring program, which was canceled due to the COVID-19 pandemic. Williams testified that after the COVID quarantine was lifted, the tutoring program was no longer offering the same services.

**{¶ 16}** Williams testified that she had also reached out to St. Rita School for the Deaf, but that no classes were being offered to children of M.S.'s and K.B.'s ages. Williams also had reached out to the Hearing and Deaf Center of Cincinnati, which only offered a three-month private tutoring session for $800, a cost which MCCS would not approve. As a result, Williams testified that she had suggested S.G. sign up for a remote ASL class for adults so that the children could sit and learn sign language with S.G. as S.G. took the class. Williams testified that she really tried to get the children enrolled in ASL classes but that the options had been limited due to the COVID-19 pandemic.

**{¶ 17}** Regarding the children's relationship with S.G., Williams testified that the

children were very bonded to S.G., had a good relationship with her, and showed her affection. Williams testified that everyone was close and comfortable with each other in S.G.'s household. Williams conveyed that she had no concerns about M.S. and K.B. being comfortable with the other children living in the home or with S.G.'s husband.

{¶ 18} Concerning Father, Williams testified that Father has a case plan with MCCS at the time of the hearing; Williams used an interpreter to discuss the objectives of the case plan with Father and provided the objectives in writing to ensure that Father understood what was expected of him. According to Williams, Father's case plan included the following objectives:

1. resolve all criminal charges and receive no new charges;

2. complete parenting classes;

3. maintain stable housing;

4. maintain sufficient income for him and the children;

5. visit the children and caseworker regularly;

6. help with the needs of the children; and

7. sign all releases of information.

{¶ 19} Williams testified that Father had completed the case plan objectives requiring him to attend parenting classes and sign releases of information. Williams also testified that Father had completed the objective to maintain sufficient income, as Williams explained that Father had worked full time at UPS since 2020 and had always had a job and maintained income.

{¶ 20} Regarding the case plan objective to visit the children regularly, Williams

testified that visitation was as agreed upon by the parties. Williams testified that S.G. described Father's visits as sporadic, while Father maintained that he visited the children regularly. According to Williams, Father visited the children approximately every other week when it was convenient for him. As to Father's helping with the needs of the children, Williams testified that S.G. had told her that Father did help out with the children's needs by buying them clothing.

{¶ 21} Williams, however, testified that Father had not completed the housing objective on his case plan. Williams testified that when she had first been assigned to Father's case, Father resided in a two-bedroom apartment with D.K. in Hamilton; they were later evicted. From there, Father had moved in with D.K.'s mother for a few months and then leased a studio apartment in Middletown, where he had stayed until the summer of 2020. Williams testified that, to her knowledge, Father was living with a friend in Columbus at the time of the hearing; Father had not secured appropriate housing despite her providing him with several referrals and applications for housing in Montgomery, Hamilton, Butler, Warren, and Franklin Counties. Williams testified that she had provided Father with this information in person, by mail, and via e-mail.

{¶ 22} In addition to providing Father with housing referrals and applications, Williams testified that, at Father's request, she had contacted housing authorities to which he had allegedly applied in Warren and Butler Counties. Williams testified that Father had been placed on a waiting list by the Warren County agency and that the Butler County agency had advised her that Father had never filled out a housing application. Williams testified that she was aware that Father was unsatisfied with her help on his housing

objective; however, Williams explained that she could only assist Father with the process and could do everything for him.

**{¶ 23}** Williams also testified that Father had failed to complete the case plan objective requiring him to resolve all of his criminal charges and to not receive any new criminal charges. Williams testified that Father had had a conviction for misdemeanor assault that he resolved in 2019 by completing court-ordered probation and anger management classes. Although Father had resolved that criminal charge, Williams testified that Father had since acquired a warrant out of Middletown for domestic violence. Williams testified that the victim of that domestic violence charge was S.G. Williams testified that she had discussed the charge with Father and had told him that he needed to get the matter resolved with the court. Williams testified that Father had denied the allegations related to the charge and had yet to resolve the matter.

**{¶ 24}** Williams also testified regarding the domestic violence incident that occurred between Father and his girlfriend, D.K., while they had been visiting the children at S.G.'s house. Williams testified that S.G. had called her and reported the incident and had provided her with a video showing the aftermath of the incident. Williams also testified to being made aware of past, unreported domestic violence between Father and Mother.

**{¶ 25}** Williams testified that she was concerned about Father's pattern of domestic violence, especially because the recent allegations of domestic violence had occurred after Father had completed the parenting class, "Family Against Violence." Williams testified that MCCS would want Father's issues with domestic violence to be

addressed before Father could get custody of the children. Williams was also concerned about Father's continuing a relationship with D.K. due to the allegations of domestic violence between them and due to MCCS's removal of D.K.'s child from her care.

### Mother's Testimony

{¶ 26} Mother testified that she did not believe Father was fit to parent M.S. and K.B. Mother testified that she had had violence issues with Father in the past and that she felt scared and unsafe when Father was present during her visits with the children. Mother also testified regarding concerns about Father drinking and smoking around the children. Mother specifically testified that she did not want the children to be placed with Father due to his issues with domestic violence and addiction.

{¶ 27} Mother also testified that she did not want the children to be placed with S.G. According to Mother, M.S. and K.B. did not have a good relationship with S.G. and would prefer to live with Mother. Mother alleged that marijuana and alcohol use occurred in S.G.'s home in front of the children, but Mother admitted that she had never reported those allegations to MCCS. Mother also testified to her concerns about there not being sufficient, child-appropriate food in S.G.'s home.

### Father's Testimony

{¶ 28} Father testified that S.G. says negative things about him to the children. Father also took issue with the fact that S.G. never learned sign language despite his being deaf. Father testified that he uses Facebook and text messaging to communicate

with S.G. Father testified that S.G.'s inability to use sign language made it difficult to communicate with her and caused a lot of misunderstandings between them. Father also testified that S.G. never took steps to have the children enrolled in ASL classes, which had made it difficult for him to communicate with the children and become close to them.

{¶ 29} Father denied ever committing physical violence against D.K. or S.G. Father also denied having any problems with anger. With regard to the recent incident of domestic violence against D.K., Father claimed that he and D.K. had simply had an argument outside of S.G.'s home and that the children had seen them arguing through the window.

{¶ 30} Father claimed that MCCS had not helped him find adequate housing and that MCCS's housing referrals had not provided him with enough support. Father claimed that his caseworker had not taken his deafness into consideration when she simply gave him paperwork on how to get housing. According to Father, he had needed more help with obtaining housing because he had had difficulty making contact with the housing agencies. Father claimed that he had asked his caseworker for more help, but that his caseworker had simply told him to look at the paperwork.

{¶ 31} Father testified that if he did not get custody of his children, he would still want to be able to take the children on short weekend trips, have sleepovers, and celebrate birthdays. Father testified that placing the children with S.G. would not be in the children's best interest because S.G. did not provide a good example for the children and deprived them of the clothing he bought them.

*Guardian Ad Litem ("GAL") Recommendation*

**{¶ 32}** The GAL did not testify at trial but supplied the trial court with a written recommendation for legal custody to be awarded to S.G. In a supplemental report, the GAL explained that the children had no established relationship with Father or Mother and noted that both parents "pop in" for visits with the children when it is convenient for them. The GAL noted that, at one point, M.S. indicated that he wanted to live with his Father. The GAL, however, found that Father did not have appropriate housing and had not completed some of his other case plan objectives. The GAL also noted that S.G. had indicated that if either Father or Mother got their life together, and if it was in the children's best interest, she would support having the children go back to them.

*Trial Court Decision*

**{¶ 33}** On May 13, 2021, the trial court magistrate issued a decision granting S.G. legal custody of M.S. and K.B. The magistrate also granted Father and Mother parenting time as agreed by the parties. Father thereafter filed objections and supplemental objections pursuant to Juv.R. 40(D)(3)(b). After taking the matter under advisement, on March 7, 2022, the trial court issued an order overruling Father's objections and awarding legal custody of the children to S.G. The trial court additionally ordered S.G. to cooperate in getting the children enrolled in sign language classes.

**{¶ 34}** Father now appeals from the trial court's legal-custody decision, raising a single assignment of error for review.

**Assignment of Error**

{¶ 35} Under his assignment of error, Father contends that the trial court erred by awarding S.G. legal custody of M.S. and K.B.   We disagree.

{¶ 36} "An appellate court will not reverse an award of legal custody absent an abuse of discretion by the juvenile court."   (Citation omitted.)   *In re J.C.*, 2d Dist. Montgomery No. 28847, 2020-Ohio-5540, ¶ 16.   " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable."   (Citation omitted.) *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).   "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988).   Because "[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record[,] * * * the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct."   (Citations omitted.)   *Id.*

{¶ 37} "R.C. 2151.353(A)(3) provides that if a child is adjudicated a dependent child, the court may award legal custody of the child 'to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child[.]' "   *J.C.* at ¶ 14, quoting R.C. 2151.353(A)(3).   "An award of legal custody 'vests in the custodian the right to have physical care and control of the child and to

determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities.' " *Id.* at ¶ 13, quoting R.C. 2151.011(B)(21). (Other citation omitted.) "Unlike an award of permanent custody * * *, '[a]n award of legal custody of a child does not divest parents of their residual parental rights, privileges, and responsibilities.' " *Id.*, quoting *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, paragraph one of the syllabus.

{¶ 38} "A juvenile court may award legal custody of a child to an individual if the court finds, by a preponderance of the evidence, that legal custody is in the best interest of the child." *Id.* at ¶ 14, citing *In re C.B.*, 2d Dist. Montgomery No. 28113, 2019-Ohio-890, ¶ 17. (Other citation omitted.) When considering the best interest of the child, courts typically look to the factors found in R.C. 3109.04(F)(1). *In re M.W.*, 2d Dist. Montgomery No. 29413, 2022-Ohio-2054, ¶ 13. "Notably, R.C. 3109.04(F)(1) does not limit courts to just the listed factors; courts are permitted to consider 'all relevant factors.' " *In re C.N., K.N. and K.N.*, 2d Dist. Montgomery No. 27119, 2016-Ohio-7322, ¶ 51. Some of the listed factors "include such things as the parents' wishes; the child's wishes, if the court has interviewed the child; the child's interaction with parents, siblings, and others who may significantly affect the child's best interests; adjustment of the child to home, school, and community; and the mental and physical health of all involved persons." *In re D.S.*, 2d Dist. Clark No. 2013-CA-51, 2014-Ohio-2444, ¶ 9, citing R.C. 3109.04(F)(1). "Those factors are similar to the factors in R.C. 2151.414(D) that govern permanent custody motions, and courts sometimes apply both provisions when considering legal custody."

*M.W.* at ¶ 13, citing *In re A.K.*, 2d Dist. Montgomery No. 27575, 2017-Ohio-8100, ¶ 13-14.

**{¶ 39}** In awarding legal custody of the children to S.G., the trial court discussed best-interest factors under R.C. 3109.04(F)(1) and R.C. 2151.414(D) and addressed the following considerations.

### Parents' Wishes
### R.C. 3109.04(F)(1)(a)

**{¶ 40}** The trial court considered that neither Father nor Mother wanted M.S. and K.B. to be placed with S.G. and that each parent wanted the children placed in their respective care. Father testified that the children should not be placed with S.G. because S.G. did not provide a good example for the children and did not give the children the clothing he bought them. Father also takes issue with S.G.'s never having learned sign language and failing to enroll the children in sign language classes. Mother testified regarding concerns about S.G.'s ability to care for and feed the children but had no concerns with S.G. being violent. Mother, however, was concerned with violence as it related to Father. Mother specifically testified that she was afraid of Father and did not want the children to be placed with Father due to his issues with domestic violence and addiction.

### Children's Wishes
### R.C. 3109.04(F)(1)(b) and R.C. 2151.414(D)(1)(b)

**{¶ 41}** The trial court did not interview the children with regard to their wishes;

therefore, the trial court did not specifically consider the children's wishes in its decision. The magistrate's decision, however, discussed the fact that M.S. once indicated to the GAL that he wished to live with Father. We further note that caseworker Williams testified that the children most recently told her that they would like to continue living at S.G.'s house where they could still have visits with their Father and with their older half-sibling.

*Children's Interaction and Interrelationship with Parents, Siblings, and Others*
*R.C. 3109.04(F)(1)(c) and R.C. 2151.414(D)(1)(a)*

**{¶ 42}** The trial court found that although Father had been "somewhat consistent with his visitation," Father had primarily been interested in visiting M.S. and only recently began visiting K.B. over the previous four or five months. Accordingly, the trial court considered the fact that Father did not have a strong relationship with K.B. The trial court also considered that M.S. and K.B. referred to S.G. as their mother and had been in S.G.'s care for multiple years. The trial court further considered that M.S. and K.B. were bonded to S.G. and the other individuals residing in S.G.'s home and that S.G. already had legal custody of the children's half sibling, A.B.

*Children's Adjustment to Home, School, and Community*
*R.C. 3109.04(F)(1)(d)*

**{¶ 43}** The trial court considered that MCCS had no concerns with S.G.'s home or ability to care for the children and that the children appeared to be well-adjusted and well cared for in S.G.'s home. The trial court further considered that the GAL recommended

that legal custody be granted to S.G. The record further indicates that the children were doing well in school.

### Mental and Physical Health of All Persons Involved
### R.C. 3109.04(F)(1)(e)

{¶ 44} The trial court considered that neither M.S. nor K.B. had been up to date on their vaccinations and medical/dental appointments when they came into S.G.'s care and that S.G. had since brought them up to date on everything. The trial court also considered that MCCS had reported no concerns with regard to Father's mental health.

### Parent More Likely to Honor/Facilitate Court-Approved Parenting Time
### Rights or Visitation and Companionship Rights
### R.C. 3109.04(F)(1)(f)

{¶ 45} Although this factor was not specifically addressed by the trial court in the decision on appeal, the magistrate's decision did discuss the fact that S.G. had an open-door policy with regard to visitation and allowed Mother and Father to visit the children whenever they wanted. The magistrate also considered a claim by Mother that S.G. was not willing to work around her schedule and that Mother was uncomfortable in S.G.'s home, especially when Father was present.

### Father's Alleged Domestic Violence

{¶ 46} In addition to considering the aforementioned statutory factors, the trial court considered the fact that there had been multiple allegations of Father committing domestic violence against S.G., Mother, and his girlfriend, D.K. The trial court noted that

both Mother and S.G. had testified that Father had engaged in domestic violence against them, and S.G. testified that Father had recently engaged in domestic violence against D.K. in front of the children. The trial court found it concerning that Father and D.K. were still in a relationship despite the reported domestic violence between them and that MCCS had removed D.K.'s child from her care.

*Father's Lack of Stable Housing*

{¶ 47} In addition to considering the domestic violence allegations, the trial court considered the fact that Father had lacked stable, independent housing throughout the case despite MCCS's providing him with housing referrals and applications and despite Father's allegedly applying for multiple housing opportunities. The record establishes that Father had been rejected from multiple housing opportunities due to his criminal background check, which included a domestic violence charge.

*Analysis*

{¶ 48} Upon review, we find that a majority of the aforementioned factors considered by the trial court weighed in favor of finding that it was in M.S.'s and K.B.'s best interest to award legal custody to S.G. Nevertheless, Father argues that the trial court's decision awarding S.G. legal custody was an abuse of discretion, because the trial court disregarded the progress he made on his case plan. The record, however, establishes that the trial court did consider Father's case-plan progress. *See* Judge's Final Appealable Order (Mar. 7, 2021), p. 9. Specifically, the trial court noted that Father

had maintained employment throughout the case, had completed his probation from a prior criminal case, and had completed his parenting classes. In any event, it is well established that compliance with a case plan is not dispositive of the trial court's best-interest determination. *In the Matter of T.S.*, 2017-Ohio-482, 85 N.E.3d 225, ¶ 12 (2d Dist.), citing *In re T.D.*, 2d Dist. Montgomery No. 27136, 2016-Ohio-7245, ¶ 12. This court has explained that:

> " '[A] parent's case plan compliance, while it may be relevant to a best interest analysis, does not automatically override a trial court's decision regarding what is in a child's best interests.' " [*In re T.D.* at ¶ 12], quoting *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 59, citing *In re N.L.*, 9th Dist. Summit No. 27784, 2015-Ohio-4165, ¶ 35. This court has recognized that "[w]hen the focus is on the child's best interest, a trial court conceivably could terminate parental rights even if a parent completed all of her case-plan objectives." *In re T.D.* at ¶ 12, citing *In re M.B.* This court also has observed that "[t]he case plan is simply 'a means to a goal, but not the goal itself,' * * *." *Id.*, quoting *In re J.H.*, 12th Dist. Clinton Nos. CA2015-07-014, [CA2015-07-015], 2016-Ohio-640, ¶ 47 (citations omitted); *see also In re R.P.*, 2d Dist. Montgomery Nos. 26744, 2015-Ohio-4295, ¶ 17[.]

*T.S.* at ¶ 12.

{¶ 49} Based on the preceding discussion, we find that the trial court's decision to award legal custody of the children to S.G., including its best-interest determination, was not an abuse of discretion.

{¶ 50} Father's sole assignment of error is overruled.

## Conclusion

{¶ 51} Having overruled Father's assignment of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and DONOVAN, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Travis Kane
Sara Barry
Charles W. Slicer, III, GAL
Misty M. Connors
S.G.
Hon. Helen C. Wallace