[Cite as *In re E.C.*, 2024-Ohio-281.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re E.C.

Court of Appeals No.  L-23-1217

Trial Court No.  JC 22289330

**DECISION AND JUDGMENT**

Decided:  January 26, 2024

* * * * *

David T. Rudebock, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**DUHART, J.**

**{¶ 1}** This is an appeal from the October 5, 2023 judgment of the Lucas County

Court of Common Pleas, Juvenile Division, terminating the parental rights of appellant,

C.C., the father of minor child, E.C., and granting permanent custody of the child to

appellee, Lucas County Children Services ("LCCS" or "the agency").  For the reasons

that follow, we affirm the judgment.

**{¶ 2}** Father sets forth one assignment of error:

The trial court's finding that father did not remedy the issue which caused the removal such that the children [sic] could not be placed with him within a reasonable time or should not be placed with him pursuant to R.C. 2151.414(E)(1), (E)(2) and (E)(13) was not supported by clear and convincing evidence when time remained on the case.

**Background**

**{¶ 3}** E.C. was born in late April 2020, in Ohio, to mother, A.O. The child was in his mother's custody when she overdosed, but did not die, in mid-May 2020. Mother then left Ohio with the child and went to Indiana, to stay with her sister ("the sister"). Father was not able to obtain custody of the child at that time, as he and mother were not married and paternity had not been established. In mid-June 2020, mother died. The child remained in Indiana, with the sister.

**{¶ 4}** Paternity of E.C. was established, and on March 9, 2022, father was awarded custody. Father did not have a job or stable housing, so he and the child lived in a shelter for a while. Father posted on Facebook for a babysitter for E.C., and M.V. responded. Father allowed E.C. to live with M.V. until he could get on his feet and find a home.

**{¶ 5}** LCCS became involved and on May 17, 2022, a complaint in dependency and neglect was filed. Father agreed to a safety plan for E.C., in which the child would remain at M.V.'s house until father was stable.

2.

{¶ 6} The court approved a case plan for father, filed on June 17, 2022, which included substance abuse treatment, with the goal of reunification.  Father engaged in substance abuse services at the Zepf Center ("Zepf"), was sober and had supervised visits with E.C.

{¶ 7} In June and July 2022, father was arrested and charged with two counts of aggravated menacing and one count of assault of M.V., as it was reported that he threatened to burn down her house and kill everybody in her family.  Father denied culpability for all of the charges.  Notwithstanding, father pled no contest to the aggravated menacing charge and to an amended charge of menacing; he was found guilty, sentenced and his jail sentences were suspended.  Father appealed those convictions; the appeals were dismissed as untimely.  A trial date was scheduled for the pending assault charge.

{¶ 8} On September 16, 2022, LCCS filed an amended complaint in dependency and neglect.  E.C. was adjudged a dependent child on September 21, 2022, and placed in the temporary custody of LCCS.  E.C. remained in M.V.'s care.

{¶ 9} In October 2022, father relapsed with alcohol.

{¶ 10} In November 2022, a trial was held on the assault charge and father was found guilty and sentenced; the jail sentence was suspended.  Father appealed his conviction; the appeal was dismissed as untimely.  Since father was on probation for a

previous OVI conviction when he was convicted of aggravated menacing, menacing and assault, he was charged with and convicted of violating his probation.

{¶ 11} On December 5, 2022, father's suspended and reserved jail sentences were enforced and he was ordered to serve his jail time, which was a little over one year, at the Correctional Center of Northwest Ohio ("CCNO").

{¶ 12} On July 5, 2023, LCCS filed a motion for permanent custody of the child, on the bases of R.C. 2151.413(D)(1) and R.C. 2151.414(B)(1).  On September 20, 2023, the trial on LCCS's motion was held.  Father attended the trial.

{¶ 13} On October 5, 2023, the juvenile court issued its judgment granting permanent custody of E.C. to LCCS.  Father appealed.

### Temporary/Permanent Custody Law

{¶ 14} R.C. 2151.353 provides in relevant part:

(A) If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:

* * *

(2) Commit the child to the temporary custody of any of the following:

* * *

(f) Any other person approved by the court.

* * *

(G) Any temporary custody order issued pursuant to division (A) * * * shall terminate one year after the earlier of the date on which the complaint in the case was filed or the child was first placed into shelter care, except that, upon the filing of a motion pursuant to section 2151.415 of the Revised Code, the temporary custody order shall continue and not terminate until the court issues a dispositional order * * *. In resolving the motion, the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier * * *.

{¶ 15} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence, two statutory prongs: (1) the existence of at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (e); and (2) the child's best interest is served by granting permanent custody to the agency. *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 12. Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

5.

**First Prong**

{¶ 16} This prong requires a finding by the juvenile court, by clear and convincing evidence, that any of the factors under R.C. 2151.414(B)(1)(a) through (e) applies. The court need only find that one factor exists. *See In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 21. *See also In re D.P.*, 6th Dist. Erie No. E-11-023, 2011-Ohio-4138, ¶ 52.

{¶ 17} Here, the court found that R.C. 2151.414(B)(1)(a) and (d) apply, which state:

> [T]he court may grant permanent custody of a child to a movant if the court determines * * * by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody * * * to the agency * * * that any of the following apply:
>
> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies * * * for [12] or more months of a consecutive [22]-month period * * *, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> * * *
>
> (d) The child has been in the temporary custody of one or more public children services agencies * * * for [12] or more months of a

6.

consecutive [22]-month period, or the child has been in the temporary custody of one or more public children services agencies * * * for [12] or more months of a consecutive [22]-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.[1]

{¶ 18} When calculating "12 of 22" time, the operative ending date is the date the agency's motion for permanent custody was filed. *In re A.C.*, 9th Dist. Summit No. 23090, 2006-Ohio-3337, ¶ 11-12, citing *In re C.W.* at ¶ 24 ("'[A] motion for permanent custody must allege grounds that currently exist.' *In re K.G.*, [9th Dist. Wayne No. 03CA0066,] 2004-Ohio-1421[,] * * * ¶ 13. A juvenile court lacks authority to grant an agency's motion [on "12 of 22"] grounds if those grounds were not satisfied when the motion was filed.").

{¶ 19} R.C. 2151.414(E) sets forth the elements necessary to satisfy a determination under R.C. 2151.414(B)(1)(a), that the child cannot or should not be placed with either parent within a reasonable time. *See In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 38. Here, the juvenile court found that R.C. 2151.414(E)(1), (2) and (13) applied, which provisions state:

---

[1] The "12 of 22" provision is found in R.C. 2151.414(B)(1)(d) and R.C. 2151.413(D)(1). LCCS set forth the latter statute as one of the bases under which it sought permanent custody of E.C.

7.

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic * * * chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section * * *;

* * *

(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.

**Second Prong**

{¶ 20} This prong concerns the best interest of the child, and when the juvenile court is making this determination, R.C. 2151.414(D)(1) provides that all factors which are relevant shall be considered by the court, including, but not limited to:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

### Permanent Custody Trial - September 20, 2023

{¶ 21} The following is a summary of the testimony offered by the witnesses at trial.

**M.V.**

{¶ 22} M.V. testified that father posted on Facebook, twice, seeking a babysitter for E.C. Following the first post, someone else watched E.C., then after the second post, M.V. messaged father to see if she could help. She did not know father personally; she was tagged about his post by a Facebook friend, whose dad was friends with father. M.V. picked up E.C. in February 2022, and he has been with her since. The agency became involved in April 2022.

{¶ 23} Father visited with E.C., usually when M.V. dropped E.C. off at father's place. M.V. cared for the child, loved him, taught him, provided for him and took him to doctor appointments. She and her husband have two other children in the home. She received no money or other assistance from father.

{¶ 24} Father consistently and continuously made threats over the phone and on Facebook to M.V., and he "threatened to kill us. He has threatened my children. He's threatened to burn our home." As a result of the threats, M.V. recalled that father was charged with and convicted of aggravated menacing, and a no-contact order was issued.

{¶ 25} Some of E.C.'s relatives contacted M.V. so they could see the child. The relatives included a few of E.C.'s siblings, mother's cousins, the sister, some of father's relatives and their children. M.V. was asked if she permitted visits to occur and she replied, "Of course." She observed that father is estranged from many of his relatives.

10.

{¶ 26} M.V. is willing to accept legal custody of the child as "with everything that has happened and the threats and things and safety[,] we just thought with keeping the doors open for [father] to constantly come in and out * * * it wouldn't be in our best interest as family as a whole."  M.V. was interested in adopting E.C., and would allow family to visit him if she adopted him, but not father due to safety concerns for her and her family.

{¶ 27} E.C. is now three years old and he is thriving.  He is talking, knows his colors, shapes and animals, can count to 20 and is potty training.

**Caseworker Kara Grabowski**

{¶ 28} Ms. Grabowski is an ongoing caseworker for LCCS, assigned to E.C.'s family in June 2022, following another caseworker who left the agency.  Grabowski reviewed the previous caseworker's notes.

{¶ 29} The case plan services outlined for father were: a dual diagnostic assessment and to follow the recommendations; attend batterer's intervention program; and attend a parenting program.  Father underwent an assessment, and intensive outpatient program ("IOP") and participation in Star Court[2] were recommended; he engaged in those services.  He was successful in Star Court for a period of time, but after the criminal allegations and his positive alcohol screens, he was terminated from the program.  Father was very compliant with services at Zepf at first, with negative alcohol

---

[2] Star Court is an additional service for substance abuse support.

screens, but then he had positive screens. His relapse, which occurred after his ankle monitor was removed, caused him to "backtrack." Father did not successfully complete his IOP due to his incarceration, so he was not referred to the batterer's class or parenting class because he was required to complete the substance abuse program first. While in jail, father could not complete the agency's programs.

{¶ 30} Father made a "huge effort" to visit the child consistently, and progressed from level one visits (most restrictive) to level two visits (less restrictive). There were no complaints about father's visits with E.C. However, due to threats that father made against the agency and threats to abscond with E.C., level one visits were again instituted and then visits were paused, about two weeks before he went to jail.

{¶ 31} When the agency first became involved, E.C. was behind on his speech, as he only said one or two words, so speech therapy was contemplated. However, the more time that E.C. spent in M.V.'s home, the more his speech improved and no therapy was needed. E.C. has been with M.V. for pretty much the entire case, and then some, and he is doing very, very well and is very well bonded with his caregivers and their children.

{¶ 32} The agency sought appropriate relative placements for E.C., but found none. LCCS is requesting permanent custody of the child, as it is in his best interest due to father's very extensive criminal history and issues with alcohol spanning four decades. Grabowski recognized that father can remain sober for a short period of time, but he still has on-going issues with alcohol, which have to be addressed following his incarceration.

12.

**{¶ 33}** Grabowski indicated that after father is released from jail, he would not have sufficient time, in the six or so months before the case reaches the two-year mark, to demonstrate to the agency that he has control over his sobriety. Further, he could not complete LCCS's programs[3] and obtain stable housing in the time remaining on the case. Father did not have enough time to do what he needs to do to get E.C. back.

**Father**

**{¶ 34}** Father testified that after E.C.'s mother overdosed in May 2020, in Toledo, he tried to take the child, but paternity was not established. Mother panicked and ran to Indiana to live with the sister. After paternity was established, E.C. was given to father and about nine months later, in March 2022, he got custody of E.C. At that time, father's living situation was "really messed up because I didn't have custody of him, I couldn't get daycare, welfare, WIC, I couldn't get nothing." Father was staying with a friend but that did not work out because she had a drug problem that father did not know about. Then, he and E.C. went to a shelter.

**{¶ 35}** Regarding knowing M.V., father said his "next girlfriend lived with [M.V.] in like 2011, and me and [M.V.] talked a few times on the phone then during that time we met and we had been friends on Facebook ever since." M.V. told father that she would watch E.C., but father "just kind of ignored it because I wasn't really confident about it."

---

[3] Father participated in and completed programs while he was in jail, but in order to be compliant with the agency, he was required to complete the agency's programs.

13.

Mutual friends said M.V. was a good person, that she could be trusted with E.C., and father "was struggling, I really didn't have no other choice, I was trying to get a job and get a place and * * * take care of my son, and she was in the beginning a savior."

{¶ 36} Father's involvement with LCCS started when someone called the agency, he did not know if it was M.V. or his United Way caseworker, and said father was homeless and "that our apartment got shot up and that is why I was being evicted out of it and that was all a lie." He admitted "we was on the verge of being evicted, the paperwork had already been processed and everything, we was just waiting on them to come." M.V. told father that she could take care of E.C. so father could try and get on his feet and get a place again; father agreed. LCCS asked for a safety plan wherein E.C. would remain at M.V.'s house until father was stable; father was fine with that.

{¶ 37} Father was given case plan services when Grabowski became the caseworker, and he immediately started services. He "graduated from LLP and I was getting ready to go to OP,[4] but they seen I dropped dirty for alcohol, so they told me they wanted to reassess everything on that and I got incarcerated before that could be taken care of."

{¶ 38} Father was in the Star program and graduated from phase one to phase two within two to three weeks, and he went from level one visits to level two within 30 to 45 days. He "was doing everything I was suppose to do -- by the book and I relapsed. * * *

---

[4] There is no indication in the record what these abbreviations mean.

14.

I got convicted of an assault case that I'm innocent of, and it just pushed me over the edge and I just said hell with it and started drinking again." While he was in jail, "the whole time * * * I've been doing better myself and doing programs and doing things I needed to." He took an eight-week anger management program and attended Seeking Safety, a recovery service program which also dealt with trauma. He enrolled in the following classes: financial literacy, job skill building, parenting, resume creation, Thinking for a Change and anger management. He informed the casework and the guardian ad litem ("GAL") about all of these programs and classes.

{¶ 39} Father told the court, "I know I messed up, I know I was basically a first-time father starting this out. I got a baby dropped in my lap and tried taking care of him and I wasn't ready to. * * * I had this baby, I couldn't get help from welfare, WIC, daycare, nobody." He said "my whole life has been where if I have a problem, I deal with it by alcohol. That's not the way to deal with it. Or I deal with it by making idle threats that I never follow through with. That's not going to save my son. That's not going to make him the person I want him to be."

{¶ 40} Father was angry about being in jail, "but maybe this is what I needed. * * * I don't want to lose my son. He is all I have. He's my world. * * * I have a huge family, but I have done so much damage from my behavior throughout the years that none of them want nothing to do with me." He does not blame them, so "[a]ll I can do is

15.

try to build them bridges back and hope some day they forgive me for what I've done to them."

{¶ 41} Father admitted he has "an extensive criminal history, but I would say 80 percent of that is due to alcoholism. I remained 100 percent sober while I've been incarcerated." He is a trustee in the honor dorm and earned seven days a month off of his sentence.

{¶ 42} He apologized to M.V. and said he was grateful for her and her family being there for E.C. Father indicated that he does not want to kick M.V. and her family out of E.C.'s life, as E.C. loves them like they are a part of his family, but father wants "to be a part of my son's family too." Father said "I messed my whole life up, I have other children that don't even speak to me because of the way I lived my life and the things I done." Father is 56 years old and has eight children; two are deceased. He shared that his "only other son got murdered in 2010 and I lived with that everyday regretting it thinking if I wouldn't have been in jail I might have been able to save my son."

{¶ 43} Father insisted that he did not deserve to lose custody of E.C. permanently, and with more time, he could prove to everyone that he can change.

**Attorney Alanna Paully, GAL**

{¶ 44} The GAL testified that she has been E.C.'s GAL since he was removed from father's care. She conducted an independent investigation with respect to E.C., and

16.

authored a report which was filed with the court. She visited with the child at M.V.'s home, she reviewed documents relevant to the case and she spoke with father.

{¶ 45} The GAL observed that the child has been in his placement for about one and a half years, he is bonded with the family, he is emotionally attached to them, he is thriving and there are no concerns with his placement.

{¶ 46} The GAL noted mother is deceased and father is in jail. The GAL met with father once, one-on-one, and saw him at the review hearings. He expressed that he loves E.C. very much, and when the GAL saw them together, father was very loving towards E.C.

{¶ 47} The GAL had concerns with father maintaining his sobriety when is out of a controlled setting (like jail or having an ankle monitor), as he tends to relapse which leads to anger management issues. When he is released from jail, father will have services that he must complete, which would likely go well beyond the four to six months remaining on the case. The GAL is aware that father took classes at CCNO, but those classes would not be adequate to complete his case plan. She feels that father taking the classes shows initiative on his part, and the classes could potentially benefit him.

{¶ 48} The GAL contacted relatives, suggested by father, for potential placement of E.C. She opines it is in the child's best interest that permanent custody be awarded to LCCS.

17.

**First Prong of Permanent Custody Analysis**

{¶ 49} The court found, by clear and convincing evidence that R.C. 2151.414(B)(1)(d) applied. The court also found, by clear and convincing evidence, that R.C. 2151.414(B)(1)(a) applied, that E.C. cannot or should not be placed with father within a reasonable time. The court relied on R.C. 2151.414(E)(1), (2) and (13).

{¶ 50} The court found, under R.C. 2151.414(E)(1), that LCCS made reasonable efforts: to alleviate the need for out-of-home placement by offering father case plan services, designed to remedy the issues; to identify, implement and finalize a plan of permanent custody and adoption for E.C.; and to prosecute the motion for permanent custody.

{¶ 51} The court also found, under R.C. 2151.414(E)(2), that despite LCCS's reasonable case planning and diligent efforts to assist father to remedy the issues which caused E.C. to be placed outside of the home, father continuously and repeatedly failed to make significant progress in his case plan services. The court found that: father has chronic substance issues; he was unsuccessfully discharged from substance abuse treatment at Zepf and Star Court; he was convicted of assault, menacing and aggravated menacing, and placed on probation; he violated probation and was ordered to serve consecutive jail terms; he was in jail at the time of the trial, with the earliest release date in January 2024; he had not even started parenting or anger management classes as

18.

required by the agency, or obtained appropriate housing; E.C. had been in care for 16 months at the time of trial; father clearly failed to alleviate any of the issues that led to E.C.'s removal; and father continues to demonstrate that he is unable to provide a stable environment for E.C.

{¶ 52} Lastly, the court found R.C. 2151.414(E)(13) applied, as father is repeatedly incarcerated which prevents him from providing care for the child.

**Second Prong of Permanent Custody Analysis**

{¶ 53} As to the child's best interest, the court considered the relevant factors in R.C. 2151.414(D)(1)(a) through (e) in reaching its determination.

{¶ 54} Regarding (D)(1)(a), the court considered E.C.'s interactions and relationships with father and others, and found: father has not visited with the child since December 2022, when he went to jail; E.C. has been placed in a "free home" for 16 months and M.V. now qualifies as "Kinship caregiver"; and E.C. has thrived in M.V.'s home and is bonded to the members of the household.

{¶ 55} With respect to (D)(1)(b), the court considered E.C.'s wishes, as expressed by the GAL since E.C. is only three years old. The court found that the GAL testified it is in E.C.'s best interest to have permanent custody granted to the agency, as that appears to be the most feasible way of providing E.C. a stable environment.

{¶ 56} Concerning (D)(1)(c), the court considered E.C.'s custodial history and found: E.C. lived with mother until she passed away, then he resided with the sister until

19.

father obtained custody; almost immediately after obtaining custody, father sought placement of E.C. in M.V.'s home due work obligations; father became unreachable and M.V. kept E.C. for several weeks without contact from father; and E.C. only spent a minimal amount of time actually in father's care.

{¶ 57} Regarding (D)(1)(d), the court considered E.C.'s need for a legally secure placement and determined an award of permanent custody to LCCS is in his best interest. The court found that no appropriate relatives were identified as willing caretakers, father is repeatedly incarcerated and mother is deceased. The court also found it was unlikely that E.C. would find a stable, legally secure and permanent placement in the absence of an award of permanent custody to the agency.

{¶ 58} With respect to (D)(1)(e), the court found that none of the factors in R.C. 2151.414 (E)(7) to (11) apply.

**Conclusion**

{¶ 59} The juvenile court concluded after considering the testimony of the witnesses, the exhibits entered into evidence and all other matters of record, that pursuant to R.C 2151.414(B)(1)(a) and (d) and R.C. 2151.414(E)(1), (2) and (13), by clear and convincing evidence, E.C. cannot and should not be placed with father within a reasonable period of time, and pursuant to RC. 2151.414(D)(1)(a) through (e), an award of permanent custody to the agency is in the child's best interest.

20.

**Assignment of Error**

**Father's Arguments**

{¶ 60} Father argues that LCCS did not prove, by clear and convincing evidence, that the child could not be placed with father pursuant to R.C. 2151.414 (E)(1), (E)(2) or (E)(13). He further argues that the juvenile court's finding that he did not remedy the issue which caused the removal such that E.C. could not or should not be placed with him within a reasonable time was not supported by clear and convincing evidence, when time remained on the case. Father sets forth that """a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.""" (Citations omitted.)

{¶ 61} Father contends it was undisputed that he made a "huge" effort to comply with case plan services by arranging for a dual assessment, engaging in services at Zepf and visiting E.C. regularly before he was in jail. Father denies that he was guilty of menacing M.V., and filed an appeal. He expects to be released from jail in December 2023.

{¶ 62} Father acknowledges he did not complete the agency's programs, but claims he has completed programs intended to help him get on his feet financially when he is released from jail. He refers to his trial testimony, that he believes his time in jail helped him prepare for sobriety and he will be able to demonstrate his sobriety and job skills after he is out of jail. He contends this court should find there is still time on the

21.

case because E.C. has been in temporary custody for about 18 months, and R.C. 2151.414(D)(2)(b) provides that temporary custody may last for 24 months. Father maintains that time had not run completely run on his ability to demonstrate compliance and stability.

{¶ 63} In conclusion, father requests that this court rule that LCCS did not prove by clear and convincing evidence that he is incapable of caring for the minor child.

**LCCS's Arguments**

{¶ 64} LCCS argues that the record supports the juvenile court's ruling, as the record indicates that although father may have engaged in services, he did not remedy his issues, as he relapsed on alcohol in October 2022, and engaged in conduct which led him to being jailed. The agency notes that father sought additional time after his release from jail to demonstrate he is able to provide care for E.C., but at the time of trial, E.C. had been in LCCS's care for nearly 18 months while father had been in jail for 10 months, was unable to participate in his case plan services and remained homeless.

{¶ 65} LCCS contends that when evaluating the changes father has made in his behavior, the record shows he relapsed, he engaged in criminal acts which led to him being jailed, and he continued to make threats up until a week prior to the permanent custody trial. The agency asserts the record is replete with actions which demonstrate that father has failed to change his conduct and he has failed to alleviate any of the issues

which led to E.C.'s removal from father's care. The agency insists that delaying permanency for this child does him a disservice.

{¶ 66} LCCS further submits that father has struggled with alcohol for decades and his criminal record shows that he has been repeatedly incarcerated due to his alcohol abuse. The agency notes that when father is jailed, it prevents him from visiting with the child or providing care for the child. The agency maintains that father's own testimony indicates he has poor coping skills and turns to alcohol when difficult situations arise.

{¶ 67} LCCS observes that trial testimony shows that E.C. is bonded to M.V. and her family, and the GAL, after completing an independent investigation, believed it to be in the child's best interest to be placed in the permanent custody of the agency.

{¶ 68} LCCS contends there was more than sufficient evidence presented for the juvenile court to find that permanent custody was in E.C.'s best interest. Thus, the agency submits that father fails to show how the court's decision was an abuse of discretion or lacked clear and convincing evidence to terminate his parental rights.

**Standard of Review**

{¶ 69} Father sets forth the standard of review is clear and convincing evidence, and "[in] determining whether a trial court based its decision upon clear and convincing evidence, 'a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.' [Sic.] *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). *In re K.C.*, [4th Dist.

23.

Athens No. 20CA8,] 2021[-]Ohio[-]184 * * *, ¶ 14." Notwithstanding, father contends "[t]his court should find that the trial court abused its discretion by awarding custody of the minor child to [the agency]."

{¶ 70} LCCS sets forth that there are two standards of review: abuse of discretion and "manifest-weight-of-the-evidence."

{¶ 71} A review of the law shows that in *In re Z.C.*, Slip Opinion No. 2023-Ohio-4703, ¶ 1, the Supreme Court of Ohio held that "the proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights * * * are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards." The appropriate standard to apply depends on the nature of the arguments presented by the parties. *Id.* at ¶ 11.

**Standards Defined**

{¶ 72} Sufficiency of the evidence is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id.*

{¶ 73} Manifest weight of the evidence "'depends on [the evidence's] effect in inducing belief.'" (Emphasis deleted.) *Thompkins* at 387, quoting Black's Law Dictionary 1594 (6th Ed.1990). When reviewing for manifest weight, the appellate court weighs the evidence and all reasonable inferences, considers the witnesses' credibility

24.

and decides whether, in resolving evidentiary conflicts, the judge lost her way and created a manifest miscarriage of justice such that the judgment must be reversed and a new trial ordered. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20.

**Analysis**

{¶ 74} After reviewing the arguments of father and the agency, we find the sufficiency of the evidence standard applies to our examination of the juvenile court's decision, where the court found, inter alia, that R.C. 2151.414(B)(1)(a) and (d) applied.

{¶ 75} Regarding the court's finding that R.C. 2151.414(B)(1)(d), the "12 out of 22" provision applied, the record shows the agency filed its motion for permanent custody of E.C. under, inter alia, the "12 out of 22" provision in R.C. 2151.413(D)(1), which provides a "[c]hild has been in the temporary custody of * * * [a] public children services agenc[y] * * * for [12] or more months of a consecutive [22]-month period." The record further shows that at the time LCCS filed its motion, in July 2023, E.C. had been in its temporary custody since May 2022, which we note is not a 22-month period. As set forth above, a motion for permanent custody must allege grounds which exist at the time the motion is filed, *In re C.W.*, *supra*, at ¶ 24, which is not the case with LCCS's motion. Thus, LCCS had no basis to move for permanent custody of E.C. under the "12 out of 22" provision. Consequently, we find that the juvenile court's finding that the "12 out of 22" provision applied is not supported by sufficient evidence.

25.

{¶ 76} With respect to the juvenile court's finding that R.C. 2151.414(B)(1)(a) applied, that E.C. could not and should not be placed with father within a reasonable time, we find, after thoroughly reviewing the record, that the court's decision to grant permanent custody of E.C. to LCCS on this basis is supported by sufficient evidence.

{¶ 77} The record reveals that father has had issues with alcohol for four decades, he has anger management issues, he has an extensive criminal history, he has been in and out of jail many times over the years, and at the time of trial, he was not in a stable place as he had no housing, no job and he was in jail.

{¶ 78} The record further shows that despite the services offered to father by LCCS to assist him in remedying the issues which caused E.C. to be placed outside of the home, father failed to make significant progress in those services. He was initially compliant with services, as he made a "huge effort" to visit E.C. consistently and he underwent an assessment and participated in substance abuse treatment, with positive results. Yet, during that time, he was charged with committing three crimes against M.V., who had taken E.C. into her home and cared for him, without payment or assistance from father; he pled to and was convicted of two of the crimes.

{¶ 79} In October 2022, father relapsed, which he claimed was because he was convicted of assault, of which he was innocent. However, the record shows that he was convicted of assault in November 2022. The record also reveals that father's visits with E.C. were eventually stopped due to threats that he made against the agency and threats

26.

to abscond with E.C. Then, in December 2022, father was ordered to serve his jail sentences, which totaled approximately one year.

{¶ 80} Ultimately, when the agency filed for permanent custody of E.C., father had not completed any of his case plan services. According to the testimony of the caseworker and GAL, father could not participate in case plan services for LCCS while he was incarcerated, and following his release from jail, in the four to six or so months remaining before the case reached the two-year mark, there was not sufficient time for father to complete his services.

{¶ 81} The record further shows that when LLCS became involved, E.C. was behind on his speech, but the more time he spent in M.V.'s home, the more his speech improved. E.C. has been with M.V. for the entirety of the case, he is thriving in her care and he is bonded with her and the family. The GAL testified it was in E.C.'s best interest to have permanent custody granted to the agency, so the child was in a stable environment.

{¶ 82} We therefore find there is sufficient evidence in the record to support the juvenile court's decision that pursuant to R.C 2151.414(B)(1)(a) and R.C. 2151.414(E)(1), (2) and (13), E.C. cannot and should not be placed with father within a reasonable period of time, and pursuant to RC. 2151.414(D)(1)(a) through (e), an award of permanent custody to the agency is in E.C.'s best interest.

27.

**{¶ 83}** We conclude that while the juvenile court erred in finding pursuant to R.C. 2151.414(B)(1)(d), that E.C. had been in the temporary custody of LCCS for more than 12 months of a consecutive 22-month period, this error is harmless, as there is an abundance of evidence in the record to support the court's finding under R.C. 2151.414(B)(1)(a).

**{¶ 84}** Accordingly, we find father's sole assignment of error not-well taken.

**{¶ 85}** On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Father is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.                           _____
                                                    JUDGE

Gene A. Zmuda, J.

Myron C. Duhart, J.                       _____
CONCUR.                                                         JUDGE

                                                  _____
                                                    JUDGE

28.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.