[Cite as *In re S.W.*, 2024-Ohio-681.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | |
|---|---|
| IN RE: S.W., A.W. | : |
| | : |
| | :     C.A. No. 29874 |
| | : |
| | :     Trial Court Case Nos. C-2023-002004-01; C-2023-002003-01 |
| | : |
| | :     (Appeal from Common Pleas Court-Juvenile Division) |
| | : |

. . . . . . . . . .

O P I N I O N

Rendered on February 23, 2024

. . . . . . . . . .

ROBERT ALAN BRENNER, Attorney for Appellant, Father

NATHAN B. VANDERHORST, Attorney for Appellee, Montgomery County Children Services

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant Father appeals from an order awarding temporary custody of his minor children, S.W. and A.W., to Appellee, Montgomery County Children Services ("MCCS"). Father contends that the juvenile court abused its discretion in granting temporary custody to MCCS. In addition, Father argues that he received ineffective assistance of counsel in the proceedings below. For the reasons discussed below, we

find that Father's assignments of error lack merit. Accordingly, the judgments of the juvenile court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 2} On April 21, 2023, MCCS filed dependency complaints regarding S.W. and A.W., contending they lacked adequate parental care due to their parents' mental or physical condition.[1] According to the complaints, MCCS had been involved with the children on August 20, 2020, based on concerns over domestic violence, physical abuse, drug use, medical neglect, and children failing to attend school. Montgomery County J.C. No. 2023-2003, Dependency Complaint (Apr. 23, 2023), p. 1. After filing complaints in September 2021, MCCS had protective supervision over the children before withdrawing the complaints without prejudice in January 2022. *Id.*

{¶ 3} On November 4, 2022, MCCS again became involved due to concerns about physical abuse and neglect and exposure to domestic violence in the home. The complaints stated that the police had been called to the home on numerous occasions for domestic violence complaints, and that on November 4, 2022, an incident occurred in the early morning hours in which Father "allegedly beat mother's head into a kitchen counter resulting in her stabbing him with a knife before he fled the house." *Id.* at p. 1-2. Mother reportedly was under the influence, and the children were present. Father was later arrested as the primary aggressor. *Id.* at p. 2.

{¶ 4} The children reported to MCCS that they knew where illegal drugs were

---

[1] Because there are two complaints, we will refer to the docket in *In re S.W.*, Montgomery J.C. No. C-2023-002003-01.

hidden in the house. In addition, Mother reported that she had experienced 16 years of violence with Father, that he had been in prison for violence against her, and that she had also refused to follow through with charges against him. *Id.*

{¶ 5} Another referral was received in November 2022 about the children being left alone with inappropriate drug use and that Mother was using cocaine; the children confirmed Mother's drug use. At that time, MCCS created a safety plan to place the children temporarily with a non-relative. However, the agency then received reports that this person was violating the plan by letting the parents reside in her home with the children, unsupervised. *Id.* Another referral was received in December 2022 concerning the fact that A.W. had bruises under her eye because Father had thrown a water bottle at her; Father denied this. *Id.* Mother then contacted police in January 2023 about Father's violation of a protection order. She accused Father of slashing her tires and stealing her phone. Later that January, Father was charged again with violating the protection order. However, Mother failed to appear and both charges were dismissed. *Id.*

{¶ 6} The complaints further alleged that Mother had lost custody of six of her other children due to violence and substance abuse in the home, and that although MCCS had regular contact with Father, he had refused to cooperate. *Id.* at p. 2-3. MCCS asked the court to adjudicate the children as dependent and to award MCCS temporary custody.

{¶ 7} On April 21, 2023, MCCS also filed a motion seeking interim temporary custody at an ex parte hearing due to violence, substance abuse, and violations of the safety plan. The same day, the court granted MCCS's motion for interim temporary

custody and set a hearing for April 24, 2023. The court also appointed a guardian ad litem for the children. At the April hearing, the court found that placement with the parents would place the children in imminent risk of harm, that the parents were unable to provide the children with a safe and stable home at that time, and that MCCS had concerns about domestic violence and substance abuse. The court, therefore, granted the agency interim temporary custody of A.W. and S.W. An adjudication hearing was set for July 10, 2023. Magistrate's Interim and Final Order (Apr. 24, 2023), p. 2-4. Subsequently, the court set a disposition hearing for July 14, 2023.

{¶ 8} A semiannual administrative review ("SAR") was filed on June 21, 2023, discussing the case's progress, which included that Father had been combative and uncooperative during most of the life of the case and had refused to provide a release of information until that week. SAR at p. 3 and 8. On the same day, MCCS filed an amended dependency complaint seeking a new disposition, which was preferred custody to MCCS or, alternatively, to the children's adult half-sibling.

{¶ 9} MCCS then filed a family case plan ("FCP") on July 5, 2023, outlining various goals, including the following items: (1) Father "will be honest about his drug use/selling, will submit to random screens and will complete an AOD assessment and follow recommendations"; (2) Father "will complete Batterer's Intervention/August Project and will demonstrate newly learned skills in his interaction with [a then 16-year-old child who was involved in the proceedings and is not the subject of the current appeal]. He will recognize behaviors that are controlling and lead to violence"; (3) Father "will obtain and maintain income that will meet the needs of his family and will provide pay check stubs to

verify legal income"; (4) Father "will obtain and maintain housing that will meet the needs of his family if he wishes to obtain custody of his children"; (5) Father "will sign releases of information for service providers as needed'; (6) Father "will meet with the CW [caseworker] at his home on a monthly basis and more often as needed to discuss case plan progress"; and (7) Father "will attend weekly visitation with his children which will be supervised until it is determined that visits do not need to be supervised. [Father] will make sure that his children know they are to tell the truth about what goes on in their home and that they are safe to report concerns." FCP (July 5, 2023), p. 8. At that time, A.W. and S.W. were in a foster home and MCCS intended to place them with a relative. *Id.* at p. 1-3.

{¶ 10} At the July 10, 2023 dependency hearing, both parents agreed to a dependency finding. Transcript of Proceedings (Dependency Hearing) (July 10, 2023), 7, 13, 15, and 18-23. The court then held the disposition hearing on July 14, 2023. During the hearing, the court heard testimony from Jeremiah Hunt, the MCCS caseworker, and from Father. At the hearing, Mother agreed to MCCS's having temporary custody, with visitation at the agency on Tuesdays from 5:00 to 7:00 p.m. until August 15, 2023, when Mother would be able to take the children off grounds for the same period of time. There would also be no contact with Father during visitation. Transcript of Proceedings (Disposition Hearing) (July 14, 2023) (Disp. Tr."), 11-12, 15, and 17-18. If any contact with Father occurred or if any domestic violence occurred between the parents, visitation would return to occurring at the agency. *Id.* at 13.

{¶ 11} During the hearing, Father did not agree to MCCS having temporary

custody. *Id.* at 11. MCCS proposed visitation for Father with the same conditions as Mother, but on Thursdays, from 5:00 to 7:00 p.m. *Id.* at 13.

{¶ 12} According to the caseworker, Jeremiah Hunt, the children were doing well in foster care and in school and did not have significant special needs, other than S.W.'s severe asthma. *Id.* at 21-25. Hunt then discussed Mother's progress on the case plan. *Id.* at 26-34. Among other things, Mother had told him that she had been hit by a car in April 2023. At first, Mother claimed it was a hit-and-run as she was exiting her food truck. (Both parents had operated a food truck together prior to May 2023.) *Id.* at 28 and 31. However, Mother then reported to Hunt in May that Father had hit her and driven over her with his truck, and she had filed for a temporary protection order (TPO), which was granted. *Id.* The TPO was later dismissed. *Id.* at 31.

{¶ 13} At a prior hearing in April 2023, Hunt saw a video of Mother and Father running into each other with vehicles. Father had a pickup truck and Mother had a food truck. Hunt discussed it with Mother, and she denied being involved in that incident. Disp. Tr. at 32 and 54. Both parents denied being involved in any "back and forth with vehicles." *Id.* at 33. Father also denied to Hunt that he had run over Mother with a food truck in April 2023. *Id.*

{¶ 14} Concerning Father, Hunt testified that Father had not been very cooperative and had refused to sign a release of information until May 25, 2023. *Id.* at 35. At the time of the hearing, Father did not appear to have his own stable housing. Hunt had completed visits with Father in several different residences, including his sister's home, his mother's home, and a residence Father had claimed to be renting on Emerson

Avenue, but for which he had no lease. *Id.* Father had also said he had been working on another address to rent separate from the Emerson residence. As a result, the housing objective was ongoing. *Id.* at 36.

**{¶ 15}** Father also had not provided verifiable information about his source of income or deposits other than showing Hunt screenshots of two business bank accounts and a savings account. In June 2023, Father had a savings balance of $10,000, a slight negative business balance in one account, and some money in the other account. *Id.* at 37-38. Father did not show Hunt any bank statements. Rather, he just provided images on his phone that showed a bank balance. *Id.* at 55. Father had also not established who owned the food truck, which was reported to be his income source. *Id.* at 36-37. In addition, Father had never been clear on his monthly income. *Id.* at 38.

**{¶ 16}** According to Hunt, Father had not engaged with the August Project for domestic violence. Disp. Tr. at 38-39. At the end of June 2023, Father brought Hunt some documentation from Samaritan Behavioral Health ("SBH"), but Hunt had not yet been able to verify with a therapist what type of domestic violence material was being addressed. *Id.* at 39-40. Father apparently had mental health and substance abuse diagnoses in November 2022, and the most recent documentation Hunt had only went through May 2023. *Id.* at 41-42. Again, Hunt had not yet been able to verify the specific treatment, and Father needed to continue to sign releases so that Hunt could verify his progress on case plan objectives. *Id.* at 42.

**{¶ 17}** Hunt did indicate that Father's visitation was very consistent and had been positive. *Id.* at 42. However, Mother was present during Father's July 6, 2023 visit,

which was against the rules. *Id.* at 34 and 43. Hunt was concerned about the possibility of the parents hurting each other. In addition, he was concerned about the ongoing interpersonal conflict and filing of TPOs and then not following through. *Id.* at 43. Anger management for Father was a huge component. *Id.* at 44.

**{¶ 18}** During the case, MCCS had contacted quite a few people in an attempt to get the children out of foster care. MCCS had planned to place the children with the most recent person (the eighth) on July 6, 2023. However, that person backed out, and MCCS was researching a ninth person. *Id.* at 44-45. The eighth person, who was Father's daughter, had expressed willingness to take the children at a later time, in mid-September 2023, when she relocated and changed addresses. MCCS kept having the same issue with Father on this subject. After Hunt met with the daughter on May 9, 2023, Father had shown up unannounced at the daughter's home three times and had parked a car in the front yard. The daughter said she was not willing to take the children until she moved because she did not want Father to have her address. *Id.* at 46-47.

**{¶ 19}** At the hearing, Father testified that his SBH therapist had previously worked for children services. According to Father, the therapist said that if he were subpoenaed, he would say that Father had "completed a case plan at least three times over." Disp. Tr. at 61. Father also stated that his domestic violence and anger management issues were being addressed at SBH. *Id.* at 63. As to why he did not sign a release until late May 2023, Father claimed SBH did not recognize MCCS's information and he had to sign SBH's release. He stated that he was going by what SBH and his therapist told him. *Id.* at 70 and 75.

**{¶ 20}** Concerning his housing, Father testified that he had sold the house he previously claimed to be renting (the Emerson Avenue home) and had been living for the past month and a half with his cousin in a five-bedroom home in Dayton. *Id.* at 63-64 and 69-70. According to Father, his cousin was planning to move to Tennessee and was going to let Father take over the house. *Id.* at 64. No documentation of any of this was provided.

**{¶ 21}** On July 14, 2023, the court filed orders granting temporary custody of A.W. and S.W. to MCCS. Among other things, the court found that: the children had been removed from Mother's care on December 8, 2022; "placement with either parent would place the children in imminent risk of harm"; Father and Mother were not adequately able to care for the children; Father "testified that he has made significant progress on his case plan but has not verified with the agency": and it was in the children's best interest for temporary custody to be granted to MCCS. Judge's Final Appealable Order (July 14, 2023), p. 2-3. The court also established visitation times for each parent and ordered that they not have contact during each other's parenting time or interfere with parenting time. *Id.* at p. 3.

**{¶ 22}** The court filed amended orders on August 4, 2023. The relevant findings were not changed, but the court added language restricting the location of off-site parenting time and ordering parenting time to revert back to the agency if the parents violated any parenting orders. Amended Judge's Final Appealable Order (Aug. 4, 2023), p. 3. Father timely appealed from the court's August 4, 2023 orders. Mother did not appeal.

## II.   Temporary Custody Award

**{¶ 23}** Father's first assignment of error states that:

The Juvenile Court Judge Abused Her Discretion by Awarding Temporary Custody of the Children to MCCS.

**{¶ 24}** Under this assignment of error, Father contends that the juvenile court abused its discretion in granting temporary custody to MCCS.   According to Father, the record indicates that he completed all of his case plan objectives, including housing, visitation, sufficient income, mental health treatment, and domestic violence and anger management.

**{¶ 25}** Under R.C. 2151.353(A), a juvenile court may make any one of several dispositional orders if a child is adjudicated abused, neglected, or dependent.   These orders include, among other things, committing the child to the temporary custody of a public children services agency or awarding legal custody to either parent or another person.   R.C. 2151.353(A)(2)(a) and (c).   " 'In choosing among the alternatives, the best interest of the child is the court's primary consideration.   Furthermore, in making its dispositional order, the court must consider which situation will best promote the "care, protection, and mental and physical development" of the child with the understanding that the court should separate a child from his family environment "only when necessary for the child's welfare or in the interests of public safety." ' "   *In re L.C.*, 2d Dist. Clark No. 2010-CA-90, 2011-Ohio-2066, ¶ 13, quoting *In re C.W.*, 3d Dist. Wyandot No. 16-09-26, 2010-Ohio-2157, ¶ 11.

{¶ 26} "When considering the best interest of the child, courts typically look to the factors found in R.C. 3109.04(F)(1)." *In re M.S.*, 2d Dist. Montgomery No. 29441, 2022-Ohio-3348, ¶ 38, citing *In re M.W.*, 2d Dist. Montgomery No. 29413, 2022-Ohio-2054, ¶ 13. "Some of the listed factors 'include such things as the parents' wishes; the child's wishes, if the court has interviewed the child; the child's interaction with parents, siblings, and others who may significantly affect the child's best interests; adjustment of the child to home, school, and community; and the mental and physical health of all involved persons.' " *Id.*, quoting *In re D.S.*, 2d Dist. Clark No. 2013-CA-51, 2014-Ohio-2444, ¶ 9.

{¶ 27} "A temporary-custody decision 'must be supported by a preponderance of the evidence.' " *In re A.A.R.*, 2d Dist. Greene No. 2021-CA-23, 2022-Ohio-93, ¶ 17, quoting *In re S.M.*, 2d Dist. Montgomery No. 24539, 2011-Ohio-6710, ¶ 4. "Preponderance of the evidence simply means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " *In re Starks*, 2d Dist. Darke No. 1646, 2005-Ohio-1912, ¶ 15, quoting *Black's Law Dictionary* 1182 (6th Ed.1998).

{¶ 28} Nonetheless, "[a] trial court has substantial discretion in weighing the considerations involved in making the determination regarding a child's best interest, and the court's determination will not be reversed absent an abuse of that discretion." *In re S.M.* at ¶ 4, citing *In re K.H.*, 2d Dist. Clark No. 2009-CA-80, 2010-Ohio-1609, ¶ 66. " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." (Citation omitted*.) AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). Most often, this

means a court's decision was based on unsound reasoning rather than being arbitrary or unconscionable. *Id.*

{¶ 29} We have also stressed that "our review is limited to determining whether the record contains competent, credible evidence supporting the trial court's decision." *In re A.A.R.* at ¶ 17, citing *In re J.T.*, 2d Dist. Montgomery No. 26839, 2016-Ohio-602, ¶ 33. On review, we are also guided by a presumption that the trial court's factual findings were correct, because "[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record." *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). *Accord In re M.S.*, 2d Dist. Montgomery No. 29441, 2022-Ohio-3348, ¶ 36.

{¶ 30} Notably, in a very recent decision, the Supreme Court of Ohio accepted a certified conflict regarding the proper standard to be applied to review of permanent custody decisions. *In re Z.C.*, Ohio Slip Opinion No. 2023-Ohio-4703, __ N.E.3d __, ¶ 1. The court remarked that confusion may have arisen due to its prior decisions, which had applied the abuse of discretion standard in custody cases. *Id.* at ¶ 12. However, the court distinguished these cases because they "involved change-of-custody proceedings under R.C. 3109.04 for the allocation of parental rights and responsibilities, not a permanent-custody determination terminating parental rights under R.C. 2151.414, for which the General Assembly has expressly prescribed a clear-and-convincing-evidence burden of proof." *Id.*, discussing *Masters v. Masters*, 69 Ohio St.3d 83, 85, 630 N.E.2d 665 (1994), and *Miller* at 74.

{¶ 31} The court, therefore, held that:

Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, we agree with those appellate courts that have determined that the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.

*Id.* at ¶ 11.

**{¶ 32}** Most cases subsequently citing *In re Z.C.* have involved permanent custody. *E.g., In re E.C.*, 6th Dist. Lucas No. L-23-1217, 2024-Ohio-281, ¶ 71. However, in the one case that did not, the Eleventh District Court of Appeals noted *In re Z.C.* in a footnote, but applied an abuse of discretion standard for purposes of reviewing a grant of legal custody. *See In re I.G.C.*, 11th Dist. Portage No. 2023-P-0026, 2024-Ohio-145, ¶ 15 and fn. 2. In light of the lower burden of proof in such cases, i.e., a preponderance of the evidence, this was appropriate. Accordingly, in situations like the present, where only temporary custody is at issue, we will continue to apply the standards we recited above, which involve abuse of discretion.

**{¶ 33}** In contending that the juvenile court abused its discretion, Father focuses primarily on his own testimony that he completed his case plan. Appellant's Brief, p. 4-5. However, the juvenile court was not required to credit Father's testimony, and the evidence in the record supported the court's decision. A significant reason for the children's removal was domestic violence. Despite Father's contention that he had been

treated, the parents' violent interactions with each other only a few months before the temporary custody hearing belied this assertion. Anger and violence continued and were a legitimate concern for the court. In addition, the parties' willingness to disregard visitation restrictions designed to protect the children was evident. Specifically, in the weeks before the custody hearing, Mother was present during Father's visitation with the children at the agency.

{¶ 34} Furthermore, Father did not maintain stable housing. During the time this action was pending, Father lived in several different places and never provided any verification of independent housing. Moreover, counsel was appointed for Father in May 2023 because he was indigent, and he did not thereafter provide MCCS with any income statements verifying the source of his income. It is true that Father's savings account showed a $10,000 balance in June 2023 (which contradicts his claim of indigence). Again, however, Father failed to provide documentation of how he earned his income, and there was no indication that it would continue, because his only source of income was a food truck. Finally, Father did not convincingly explain why he had waited so long to provide MCCS with information about his treatment.

{¶ 35} In light of these points, the juvenile court did not abuse its discretion in awarding temporary custody of the children to MCCS. Accordingly, the first assignment of error is overruled.

### III. Ineffective Assistance of Counsel

{¶ 36} Father's second assignment of error states that:

Father Was Denied Effective Assistance of Counsel in the Trial Court.

{¶ 37} Under this assignment of error, Father contends that he received ineffective assistance of counsel in the juvenile court. His primary point is that his trial counsel erred in failing to call Father's SBH therapist, "Max," who would have testified that Father had " 'completed a case plan three times over.' " Appellant's Brief at p. 5, quoting Disp. Tr. at 61.

{¶ 38} Our district has recognized the right to effective assistance of counsel in "actions seeking the permanent, involuntary termination of parental custody." *In re J.D.*, 2d Dist. Montgomery No. 26588, 2015-Ohio-4114, ¶ 79. This is because " 'the permanent termination of parental rights has been described as "the family law equivalent of the death penalty." ' " *In re A.T.*, 2d Dist. Montgomery No. 28332, 2019-Ohio-3527, ¶ 68, quoting *In re S.A.*, 2d Dist. Clark No. 2007-CA-110, 2008-Ohio-2225, ¶ 7. (Other citation omitted.)

{¶ 39} "An award of legal custody is not the equivalent of, nor as drastic as, a permanent custody award, because legal custody 'does not divest a parent of residual parental rights, privileges, and responsibilities.' " *In re P.S.*, 2d Dist. Montgomery No. 28812, 2020-Ohio-4929, ¶ 7, quoting *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, ¶ 17. This is likely the reason the Fifth District Court of Appeals has declined to extend "the doctrine of ineffective assistance of counsel beyond criminal cases and those involving permanent custody." *In re L.J.W.*, 5th Dist. Ashland No. 16 COA 013, 2016-Ohio-7054, ¶ 12. *Accord In re B.H.*, 5th Dist. Richland No. 18CA95,

2019-Ohio-1508, ¶ 45. Other districts, however, have applied the doctrine in temporary custody cases. *See In re Q.S.*, 2023-Ohio-712, 210 N.E.3d 610, ¶ 130-131 (8th Dist.); *In re Graves*, 11th Dist. Geauga No. 99-G-2219, 2000 WL 816320, *7 (June 23, 2001); *In re H.D.D.*, 10th Dist. Franklin No. 12AP-134, 2012-Ohio-6160, ¶ 55 (same).

{¶ 40} In a case involving a temporary custody situation, our district also has said that while "ineffective assistance claims are typically raised in cases involving termination of parental rights, they have also been considered in less serious juvenile matters, due to the requirement in R.C. 2151.352 that counsel be furnished at all stages of juvenile proceedings." *Matter of Lannom*, 2d Dist. Clark No. 1996-CA-64, 1997 WL 761323, *10 (Dec. 12, 1997), citing *Matter of Mull*, 3d Dist. Seneca No. 13-96-38, 1997 WL 155412 (Mar. 24, 1997). In *Mull*, the court remarked that "[u]nder R.C. 2151.352, the right to counsel implies effective assistance of counsel." This statute, indeed, does provide for a right to counsel. Consequently, we will consider Father's assignment of error.

{¶ 41} To succeed on ineffective assistance claims, a party must establish: (1) trial counsel's deficient performance; and (2) that the deficient performance caused prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. In order to prove deficient performance, a defendant must show that "counsel's performance fell below an objective standard of reasonable representation." *Strickland* at 688. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine

confidence in the outcome." *Id.* at 694. "In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law." *Id.*

{¶ 42} After reviewing the record, we find no evidence of deficient performance or prejudice. "The defendant or petitioner has the burden of proof on the issue of ineffective assistance of counsel, as licensed attorneys in Ohio are presumed to be competent." *State v. Southern*, 2d Dist. Montgomery No. 27932, 2018-Ohio-4886, ¶ 47, citing *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). "Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance." *In re J.J.,* 10th Dist. Franklin No. 06AP-495, 2006-Ohio-6151, ¶ 29, citing *State v. Sallie*, 81 Ohio St.3d 673, 675, 693 N.E.2d 267 (1998).

{¶ 43} Furthermore, "[a]n appellant is not deprived of effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic." *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56 (2d Dist.), citing *State v. Brown*, 38 Ohio St.3d 305, 319, 528 N.E.2d 523 (1988). For example, "[f]ailing to question witnesses on cross examination and choosing not to present witnesses fall within the realm of trial strategy." *In re Riley*, 4th Dist. Washington No. 03CA19, 2003-Ohio-4109, ¶ 21. In addition, the law is "well settled that debatable trial tactics do not give rise to a claim for ineffective assistance of counsel." *In re Simon*, 9th Dist. Wayne No. 00CA0072, 2001 WL 651519, *2 (June 13, 2001), citing *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980).

{¶ 44} In the case before us, trial counsel could have had various reasons for failing to call Father's therapist to testify. Notwithstanding Father's unsubstantiated statements about what his therapist would say, it is quite possible that cross-examination may have disclosed matters unfavorable to Father's case. Appellate courts do not second-guess counsel's decisions on trial strategy. *In re B.B.*, 2d Dist. Greene No. 2015-CA-1, 2015-Ohio-3790, ¶ 29.

{¶ 45} The trial testimony that Father cites indicates that: (1) Father's therapist would have said that Father had "completed his case plan three times over"; and (2) Father's therapist or a doctor would have been willing to testify if subpoenaed. Appellant's Brief at p. 5, citing Tr. at 61 and 75. However, we have already rejected Father's statement about completing his case plan, because he did not complete most of it. Therefore, whatever Father's therapist may have said on that point is irrelevant. In addition, a general statement that someone may have testified if subpoenaed is meaningless and does not support a claim of ineffective assistance of counsel. Accordingly, Father's second assignment of error is without merit and is overruled.

IV. Conclusion

{¶ 46} Both of Father's assignments of error having been overruled, the judgments of the juvenile court are affirmed.

. . . . . . . . . . . . .

TUCKER, J. and LEWIS, J., concur.